**STATE of Minnesota, Respondent,**

**v.**

**Michael J. JOHNSTON, Appellant.**

**No. C9–86–9.**

Court of Appeals of Minnesota.

July 22, 1986.

Review Denied Aug. 27, 1986.

**452**

Hubert H. Humphrey, III, Atty. Gen., James B. Early, Sp. Asst. Atty. Gen., St. Paul, Stephen C. Rathke, Crow Wing County Atty., Brainerd, for respondent.

C. Paul Jones, State Public Defender, Susan K. Maki, Asst. State Public Defender, Minneapolis, for appellant.

Considered and decided by RANDALL, P.J., and LANSING and HUSPENI, JJ., with oral argument waived.

## OPINION

HUSPENI, Judge

Appellant Michael Johnston was convicted of second degree felony murder in violation of Minn.Stat. § 609.19(2) (1984). The trial court sentenced appellant to 240 months in prison, an upward durational departure. On appeal, appellant argues that (1) he was too intoxicated to form the necessary intent to commit a felony assault, (2) the State's chief witness was an accomplice and her testimony was not sufficiently corroborated, and (3) the trial court abused its discretion in sentencing him. We affirm.

## FACTS

Appellant's conviction arises from an incident which occurred on September 13, 1985, at Pamela Bates' home in Brainerd, Minnesota.

Pamela Bates lived with her husband and daughter. Around July 1, 1985, Bates' husband permitted Robert Lattery to move into their house.

In late August 1985, after Bates' husband went to jail to serve 120 days for an aggravated DWI, appellant stayed at Bates' house and had a sexual relationship with her.

The State's chief witness at trial was Pamela Bates. She testified that on September 12, 1985, at about 10:30 a.m., appellant called her from the Dutch Room Bar in Brainerd and asked her to join him. Bates, her daughter and Lattery drove to the bar. At the bar, Bates saw appellant drink at least four or five vodka sours; she drank pop. At about 11:30, they left and dropped Lattery off at the local hospital for treatment of an infected cut. Bates, her daughter and appellant then went to another bar in Brainerd and stayed there until about 1:30. Bates again drank pop and appellant had a couple of drinks. Bates then

dropped appellant off at the Dutch Room Bar and returned home to get ready to work her 3–11 shift at a local paper mill. Subsequently, she picked up appellant at the Dutch Room Bar and appellant drove her to work.

During her 5:30 break at work, Bates called home and talked to both Lattery and appellant. Appellant told her he just awoke from a nap.

A customer of the Log Cabin Bar in Brainerd testified that he had three drinks with appellant and Lattery at the bar between about 5:00—5:30. When appellant and Lattery left, they said they were going to the Dutch Room Bar. Another person testified that he saw appellant and Lattery outside the Log Cabin Bar at about 5:30.

Appellant picked Bates up from work at 11:00 and they went to the Dutch Room Bar. Bates testified that appellant did not appear intoxicated at that time. En route to the bar, appellant told Bates that he did not have any money left from a $50 bill he had cashed earlier that day and that Lattery told him that he (appellant) gave some money to Lyman Carlson, another friend of theirs, for babysitting Bates' daughter.

Carlson was at the Dutch Room Bar when they arrived. While at the bar, Bates drank eight or nine beers and about three shots of schnapps. Carlson was drinking too, but there is no evidence of how much he drank. Bates testified that appellant drank at least five tequila slammers (a shot of tequila followed by a glass of beer). The bartender/part-owner testified that appellant had between five and ten drinks with tequila and four or five glasses of beer.

At the bar, Carlson told appellant that he had not received any money from appellant. Appellant then concluded that Lattery must have taken his money and he told Bates and Carlson that he wanted to beat up Lattery in order to teach him a lesson. Both the bartender/part-owner and the other owner of the Dutch Room Bar testified that they heard appellant's threats.

When the bar closed, Bates, Carlson and appellant went to Bates' house after buying a 12-pack of 3.2 beer. As soon as they arrived at the house, appellant and Carlson asked Lattery if he had taken appellant's money. Lattery denied their accusations and Carlson hit Lattery in the face. Bates testified that, after Carlson hit Lattery a few times, appellant started hitting Lattery in the face with his hands and kicking him in the face and upper body. At some point, appellant took off all his clothes except his underwear. Appellant continued to kick Lattery after he fell down. Lattery did not attempt to fight back, but he tried to protect himself by covering his face.

During the fight, Bates sat in the living room drinking beer. She testified that she told appellant to stop fighting and she asked Carlson to try to stop it. Carlson asked appellant to stop, but to no avail.

Bates testified that after the fight appellant said something like he "did a good job on him." She further testified that, after Lattery lay on the living room floor for about fifteen minutes, appellant dragged him out of the back door by his feet to the Tom Thumb dumpster located behind the house. On cross-examination, Bates indicated that she did not really remember who dragged Lattery outside.

At trial, Bates did not remember anything that happened after Lattery was dragged out of the house. She did not recall whether she went outside or not. Bates was impeached by her prior statements to the police which indicate that she went outside and tried to help put Lattery in the dumpster. Some of Bates' other prior statements were also inconsistent with her testimony at trial. On cross-examination, Bates admitted that she could not remember certain details of the evening because she blacked out from drinking too much.

The next morning Lattery was found dead near the dumpster. His shirt was pulled up around his neck, dirt was imbedded in his skin and his body had scrape marks.

Just before the police arrived at the Tom Thumb on the morning of September 13, Connie Bement and another acquaintance of appellant's stopped by the Bates' house. The acquaintance testified that appellant said he had beat up somebody the night before.

Bates testified that when they saw the police at the Tom Thumb store appellant "said something about that he did a good job on him." She told appellant to hide his bloody underwear between the mattress and the box spring of her bed and he followed her suggestion. The police subsequently found the underwear there.

Bates also testified that the next day she saw in the house an almost-empty liter bottle of vodka that was not there when she went to work the day before.

In a September 13, 1985, statement to a BCA investigator, appellant said that he was a very good fighter and he could kick above his head. In his statement, appellant claimed that the night before when he returned from the bar he went to sleep on the couch and awoke while Lattery was digging in his pockets and, in self-defense, he kicked Lattery once in the face. He denied dragging Lattery out of the house, but he said it was possible that someone else did. The investigator testified that he smelled alcohol on appellant while he was interviewing him.

At trial, there was testimony about a previous fight that occurred between Lattery and appellant on September 6, 1985, about a week before Lattery's death. On that particular day, Lattery, appellant, a friend of Lattery's named Ernie Mitchell, and Bates were drinking at Bates' house. Appellant and Mitchell accused Lattery of stealing some money from Mitchell and an argument ensued. Appellant hit and kicked Lattery a number of times and Lattery tried to protect himself by covering his face with his hands. Bates testified that appellant said he wanted to put Lattery in the Tom Thumb dumpster, but instead he dragged him down into the basement.

Eventually, Lattery came back upstairs on his own accord or with the help of appellant and Bates. The next day appellant apologized to Lattery for beating him up. Mitchell admitted he did not have any money for Lattery to steal.

Connie Bement and Carlson arrived at the Bates' house while Lattery was still in the basement. Bement's testimony regarding the aftermath of the fight is generally consistent with Bates' testimony. In addition, Mitchell's testimony about the fight on September 6 is generally consistent with Bates' testimony.

Another acquaintance of appellant's testified that later appellant told her about the September 6 fight. He told her that he had been afraid that he had killed Lattery, and that he would have put him in the dumpster if he had. She characterized appellant's tone of voice as bragging.

Many photographs taken at the Bates' house and the Tom Thumb store were admitted into evidence. Some photographs indicated that something had been dragged across the backyard to the Tom Thumb dumpster. Other photographs showed various blood spots that were found on the floors in the house.

The pathologist who did an autopsy of Lattery testified that Lattery had some broken ribs, a fractured jaw, some fractured teeth, and an internal hemorrhage in the skull. He testified that Lattery died within two hours after the skull injury which he concluded was caused by some type of blunt trauma to his head. Either one blow or several blows could have caused the injury.

A BCA laboratory analyst testified that the blood samples taken from the dining room carpet, the basement floor, the frame of the basement door, and appellant's underwear could have come from Lattery, but not from appellant, Carlson, or Bates. Other blood samples taken from the kitchen and living room floors and other parts of the basement, as well as from appellant's jeans and socks, were consistent with coming from Lattery or Carlson, but could not have come from appellant or Bates. (For these particular blood samples, the

analyst could not distinguish between Lattery's and Carlson's blood.)

At the time of Lattery's death, his blood alcohol level was .24.

### ISSUES

1. Is there sufficient evidence to support the jury's determination that appellant's intoxicated condition did not prevent him from forming the intent to commit a felony assault?

2. If Bates was an accomplice, is there sufficient corroboration of her testimony to sustain appellant's conviction?

3. Did the trial court abuse its discretion in departing durationally from the sentencing guidelines?

### ANALYSIS

#### I.

Appellant first argues that his intoxicated condition prevented him from forming the intent to commit a felony assault, the underlying felony of his second-degree felony murder conviction.[1]

There is no presumption that a defendant who has been drinking is incapable of formulating the intent to commit a crime. *State v. Wahlberg*, 296 N.W.2d 408, 416 (Minn.1980). The question of whether appellant was too intoxicated to form the intent to assault Lattery was a question of fact for the jury. *See State v. Fratzke*, 354 N.W.2d 402, 408 (Minn.1984). Appellant had the burden of establishing his intoxication defense by a fair preponderance of the evidence. *See In re M.D.S.*, 345 N.W.2d 723, 735 (Minn.1984).

Despite the existence of some contrary evidence, there is sufficient evidence to support the jury's rejection of appellant's intoxication defense. *See Wahlberg*, 296 N.W.2d at 416. We recognize that the evidence is undisputed that appellant drank excessively during the several hours prior

to the fight. Nevertheless, appellant's actions could still be viewed as intentional. A similar fight occurred just a week earlier. On the day of the incident, appellant contemplated the fight. He suggested several times while at the Dutch Room Bar before the fight that he was going to beat up Lattery. In addition, appellant's comments after the fight could indicate that he remembered what he did. Further, appellant's actions were not those of someone acting without the intent to commit great or substantial bodily harm: He repeatedly aimed his kicks and hits at Lattery's face. There is sufficient evidence to support the jury's conclusion that appellant's intoxication did not render him incapable of forming the necessary intent.

#### II.

Even if Bates was an accomplice as a matter of law, there is no merit to appellant's argument that the State failed to sufficiently corroborate her testimony.

The testimony of an accomplice must be corroborated by other evidence tending to convict the defendant. Minn. Stat. § 634.04 (1984). It is not necessary that the corroborating evidence establish a prima facie case of the defendant's guilt, but it must point to the defendant's guilt in some substantial degree. *State v. Adams*, 295 N.W.2d 527, 533 (Minn.1980). Sources of corroborating evidence may include circumstantial evidence, the conduct and admissions of the defendant, and scientific analysis of physical objects connected with the alleged crime. *State v. Mathiasen*, 267 Minn. 393, 398, 127 N.W.2d 534, 538 (1964); *State v. Rasmussen*, 241 Minn. 310, 313, 63 N.W.2d 1, 3–4 (1954).

Other witnesses' testimony, apart from Bates' testimony, points to appellant's guilt. The owners of the Dutch Room Bar testified that appellant was threatening to beat up Lattery just before the fight oc-

1. The jury must have found appellant guilty of first, second or third degree assault. First degree assault requires intent to inflict "great bodily harm", second degree assault requires intent

to assault with a "dangerous weapon", and third degree assault requires intent to inflict "substantial bodily harm" Minn.Stat. §§ 609.221, –.222, –.223 (1984 & Supp.1985).

curred. An acquaintance testified the day after the fight that appellant admitted that he beat up someone the night before. Three other witnesses' testimony about the September 6 fight is consistent with Bates' testimony.

The physical evidence presented at trial corroborates Bates' testimony. Photographs of the house and yard taken on September 13, 1985, are consistent with Bates' description of where both fights occurred. Blood stains consistent with Lattery's blood type were found where Bates testified Lattery laid after the fights. Appellant's underwear, soiled with blood that was consistent with Lattery's blood type, were found where Bates testified she told appellant to put them. The pathologist's testimony is also consistent with Bates' testimony.

Even appellant's statement to the police corroborates some parts of Bates' testimony. He commented that he could kick above his head and he admitted that he had kicked Lattery once in the face.

The evidence in the record supports appellant's guilt and is sufficient to corroborate Bates' testimony and sustain appellant's conviction.

### III.

Appellant also challenges the trial court's upward durational departure from the sentencing guidelines.

The presumptive sentence for appellant's conviction, based upon an offense severity level of IX and a criminal history score of three, is a prison term of 149 months (with a range of 143–155 months). The trial court sentenced appellant to 240 months in prison.

The trial court based its departure upon the following factors: (1) two of appellant's prior convictions caused personal injury; (2) Lattery was a victim particularly vulnerable due to his intoxication and appellant was aware of this vulnerability; (3) appellant treated Lattery with particular cruelty; (4) the crime occurred in Lattery's zone of

privacy; and (5) appellant attempted to conceal Lattery's body.

A trial court may depart from the sentencing guidelines when substantial and compelling circumstances are present. *State v. Back,* 341 N.W.2d 273, 275 (Minn. 1983) (quoting *State v. Kindem,* 313 N.W.2d 6, 7 (Minn.1981)). The trial court has broad discretion in deciding whether to depart from the guidelines and we will not reverse it absent an abuse of that discretion. *Id.*

■ We find no abuse of discretion here. Appellant was convicted of an offense in which the victim was injured and the trial court did not clearly err in finding that appellant has two prior felony convictions for offenses in which the victims were injured. *See* Minnesota Sentencing Guidelines and Commentary II.D.103.2.b(3). This factor alone is sufficient to justify a durational departure. *State v. O'Brien,* 369 N.W.2d 525, 527 (Minn.1985). Appellant cites no authority for his assertion that the magnitude of a prior victim's injury is relevant to this aggravating factor. Any unfairness that may have occurred as a result of the trial court's reliance on this aggravating factor is mitigated by the presence of other valid aggravating factors.

■ The trial court appropriately relied on the fact that Lattery was treated with particular cruelty. *See* Minnesota Sentencing Guidelines and Commentary II.D. 103.2.b(2).

■ Factor (5) dealing with appellant's concealment of the body can be a valid aggravating factor when combined with an effort to bargain with information concerning the body's location. *See State v. Schmit,* 329 N.W.2d 56, 58 n. 1 (Minn.1983); *State v. Shiue,* 326 N.W.2d 648, 655 (Minn. 1982). Here, appellant did not attempt such a bargain. Nor did appellant make any other attempts to conceal the identification of Lattery. *Cf. State v. Jackson,* 370 N.W.2d 72, 74 (Minn.Ct.App.1985), *pet. for rev. denied,* (Minn. Aug. 20, 1985). However, we consider that appellant's attempt to dispose of Lattery's body in the

dumpster relates to the "particular cruelty" of his crime.

■ We note that factor (2) dealing with Lattery's alleged vulnerability was not a proper aggravating factor in this case. The particular vulnerability of a victim can be an appropriate aggravating factor. Minnesota Sentencing Guidelines and Commentary II.D.103.2.b(1). We need not address whether physical impairment from intoxication falls within the parameters of this aggravating factor, because we do not believe there is enough evidence in the record to determine whether Lattery's intoxication was a substantial factor in appellant's assault. *See State v. Gardner,* 328 N.W.2d 159, 162 (Minn.1983).

■ We also disagree with the trial court's reliance on factor (4) dealing with Lattery's zone of privacy. An invasion of a victim's zone of privacy can justify a durational departure. *See State v. Winchell,* 363 N.W.2d 747, 750 (Minn.1985). Here, however, the evidence does not indicate that Lattery had a "zone of privacy" at the Bates' house. Lattery had been assaulted in the house the week before and there is evidence that Bates did not want Lattery to continue living there. In addition, appellant was not a stranger to the Bates' household as is normally the case when this factor is used to justify a sentencing departure. *See, e.g., Back,* 341 N.W.2d at 277; *State v. Van Gorden,* 326 N.W.2d 633, 635 (Minn.1982).

Excluding factors (2) and (4), the trial court enumerated sufficient aggravating factors to justify its departure.

## DECISION

The evidence is sufficient to support the jury's rejection of appellant's intoxication defense and Bates' testimony is sufficiently corroborated. The trial court did not abuse its discretion in departing durationally from the sentencing guidelines.

**Affirmed.**