[No. 10040-1-II.   Division Two.   August 10, 1988.]

THE STATE OF WASHINGTON, *Respondent*, v. STEVEN J. TOENNIS, *Appellant*.

*Albert Armstrong, Darcy J. Scholts,* and *Mozena & Armstrong,* for appellant (appointed counsel for appeal).

*Arthur D. Curtis, Prosecuting Attorney,* and *Roger A. Bennett, Deputy,* for respondent.

ALEXANDER, J.—Steven Toennis appeals his conviction of murder in the second degree. He contends that the trial court erred in (1) denying his motion for a change of venue; (2) not excusing certain jurors for cause; (3) admitting testimony concerning the "Battered Child Syndrome"; (4) admitting evidence of Toennis's prior bad acts; (5) admitting certain photographs of the deceased victim. We affirm.

Toennis was charged in Clark County Superior Court with the second degree murder of 4–year–old Jason Stonehocker. Toennis moved for a change of venue claiming that he could not receive a fair trial in Clark County because of extensive pretrial newspaper publicity. Specifically, he claimed that numerous false or inflammatory articles about the events leading to the charges against Toennis had appeared in Vancouver's daily newspaper, The Columbian.[1] The articles in question began running in The Columbian

---

[1]Toennis indicated that several newspaper articles about the incident appeared in Portland's daily newspaper, The Oregonian. However, Toennis's primary concerns relate to the publicity in The Columbian.

on February 12, 1986 (2 days after the murder allegedly occurred), and continued to appear in that newspaper up to May 12, 1986 (the day jury selection began).[2]

The articles, copies of which were made part of the record, contained statements that the 4–year–old victim's ears had been "nearly torn from his head" and that the child had "cigarette burns all over his body." In addition, several of the articles contained a quote from the county coroner, Dr. Archie Hamilton, that the incident was "the worst case of child abuse I've ever seen in all my life. I can't see how you could abuse a little one any more." In some articles, the county prosecutor, Art Curtis, was credited with stating that Toennis was charged with a more serious crime than his codefendant, Kellie Stonehocker (the child's mother), because the authorities believed that Toennis's participation in the victim's death was more direct. Other articles noted that the victim had been disciplined for his bed wetting problem.

The Columbian also carried letters to the editor from many citizens condemning (1) child abuse, (2) those who failed to contact authorities about abuse, and (3) the judicial system for what they claimed was lenient treatment of child abusers.

In support of his motion for a change of venue, Toennis supplied the trial court with a transcript of an interview with a physician who stated that he was unable to say with certainty that the marks on the victim's body were cigarette burns. In addition, the doctor indicated that his examination of Jason's remains revealed that the boy's ears had not been torn off.

At the hearing on the change of venue motion, the prosecutor said that the source of the information he gave to the

---

[2]Articles concerning the incident appeared in The Columbian after jury selection began. Once the jury selection process commenced, however, the trial judge admonished the jury to refrain from reading or listening to any news accounts concerning the case. There is no suggestion that the admonishment was not obeyed by the jurors.

press about the condition of the victim's body was Coroner Hamilton.

The trial court denied Toennis's motion for change of venue.[3] It ruled, however, that during the jury selection process any juror who had been exposed to pretrial publicity would be examined individually outside the presence of other prospective jurors.

During voir dire, Toennis exercised all of his peremptory challenges. He successfully challenged for cause four prospective jurors who had expressed doubt about their ability to be fair and impartial. The trial court denied six of Toennis's challenges for cause. Only one of those challenged persons remained on the jury.

After 2 days of voir dire, 12 jurors and an alternate ultimately were sworn to hear the case. Some of the jurors selected for the panel indicated that they had not heard of the case, whereas others said they had heard about it. All of the jurors indicated that they could base their decision only upon evidence presented in court. In addition, all of the jurors assured the trial court that they had not formed an opinion regarding the guilt or innocence of the defendant.

Kellie Stonehocker, testifying for the State,[4] said that she and her son, Jason, had begun living with her boyfriend, Toennis, in August 1985 in a trailer in Camas, Washington. According to Stonehocker, Toennis physically punished Jason at times. Stonehocker explained that on February 10, 1986, Toennis sent Jason outside the trailer to clean himself up and to wash his clothes because Jason had wet his bed. Jason was kept outside in cold weather for most of the time between 3 p.m. and 10 p.m. At approximately 10 p.m., Toennis went outside to check on Jason. Stonehocker said that she heard Toennis screaming at the boy. She said that Jason cried, and she assumed that this

---

[3]Toennis renewed his change of venue motion twice during trial, but each time the court denied the motion.

[4]Stonehocker was initially charged in the same information with Toennis, but her trial was severed from Toennis's.

was because Toennis was hitting him. She also heard a splash of water.

According to Stonehocker, Toennis then carried Jason into the house and dropped him on the floor. She said that the child was wet, his eyes were dilated, and his breathing was raspy. Stonehocker changed Jason's clothes and then wrapped him in a blanket. She stayed up with him until about 2 a.m. The next morning, the couple discovered that Jason was dead. They then took Jason's body to the hospital.

Toennis moved to exclude expert testimony concerning the "Battered Child Syndrome." The motion was denied. Dr. Lewman, a board certified forensic pathologist, testified that Jason was a battered child. The doctor explained that the term "Battered Child Syndrome" describes cases of maltreatment, physical beatings, scaldings, and a wide variety of different assaults to children. According to Lewman, the injuries in such cases usually take place over a long period of time, and consequently, the victims display injuries of different ages with varying periods of healing. He pointed out that battered children usually die of head injuries. In his opinion, Jason had experienced repeated physical injuries over a broad time frame. He opined further that Jason died of a "subdural hematoma," which is a hemorrhage beneath the sac covering the brain. He believed the fatal injury was caused by multiple blunt force blows to Jason's head.

The nurse who examined Jason at the emergency department of St. Joseph's Hospital testified that Jason had extensive bruises and swelling on his face, eyes, and ears, as well as on most of his body. According to her, some of the bruises appeared to be of recent origin and others were old.

Another doctor who examined Jason said that he observed hair missing on the back of Jason's scalp. He also observed a large amount of swelling on Jason's elbow and a laceration of the child's upper lip. X–rays revealed that Jason's elbow had been broken about 2 to 3 weeks before his death.

Toennis moved to exclude photographs of the victim, which he argued were unnecessary and inflammatory. The trial court ruled that it would allow introduction of a representative number of photos.[5]

Toennis also moved to exclude evidence of his prior mistreatment of Jason. The trial court denied the motion. One of Toennis's neighbor's testified that sometime before Jason's death he had seen Toennis kick Jason in the buttocks several times so hard that Jason fell down. The neighbor also noticed Jason standing outside the trailer in the rain. When the neighbor questioned Toennis about what he had observed, Toennis indicated that Jason was told to stay outside until he got himself cleaned up.

Another neighbor testified that he saw Toennis slap Jason in the mouth. The next day the neighbor observed that Jason had a "fat lip" and a "black eye." When he confronted Toennis about his observations, Toennis said that Jason had fallen. Another acquaintance of Toennis's noticed in October or November of 1985 that Jason had a cut lip and that his eye was swollen. He also questioned Toennis, who said that he smacked Jason in in the mouth every time he lied.

Kellie Stonehocker testified that she had seen Toennis hit Jason in the head with his knuckles, paddle him with a pine stick on his buttocks, kick him with cowboy boots, and slap him in the mouth. Although Stonehocker knew that Jason had hurt his arm, Jason and Toennis had told her that it was caused when Jason fell on his way to the creek.

Toennis testified that on the day Jason died, he had lost his temper with Jason for taking so long to do the wash. Toennis denied striking Jason time after time, but conceded that he hit the child on that day. He said that Jason hit the washtub, but he was not sure how. He also denied breaking Jason's arm or causing marks on Jason's legs.

---

[5]The trial court excluded 32 photographs of the victim, which it deemed unnecessary or unduly prejudicial. It admitted 11.

Toennis explained that Jason fell down often. According to Toennis, he did not mean to hurt Jason.

The jury found Toennis guilty of murder in the second degree.

# I

## Change of Venue

██ Toennis first argues that the trial court erred in denying his motion for a change of venue because of what he claims was extensive, unfair pretrial publicity. A motion for change of venue in a criminal case is directed to the sound discretion of the trial court, and its decision will not be disturbed on appeal absent a "convincing showing of an abuse of discretion." (Citations omitted.) *State v. Stiltner,* 80 Wn.2d 47, 52, 491 P.2d 1043 (1971). It is error for a trial court to deny a motion for change of venue where the conclusion is inescapable that a change of venue is necessary to guarantee a defendant's right to a fair trial by an unbiased jury. *Stiltner,* 80 Wn.2d at 53. A denial of due process may be found even without an affirmative showing of actual prejudice. When the circumstances show a probability of prejudice, the trial is deemed to be inherently lacking in due process. *Stiltner,* 80 Wn.2d at 54.

The mere fact that jurors may know about a case is not the central issue. In *Patton v. Yount,* 467 U.S. 1025, 1035, 81 L. Ed. 2d 847, 104 S. Ct. 2885, 2891 (1984), the United States Supreme Court said that the fact that a great majority of veniremen knew about the case is irrelevant:

> The relevant question is not whether the community remembered the case, but whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant.

In determining whether a motion for change of venue should be granted because of pretrial publicity, trial courts should be guided by the following factors in determining whether due process will be afforded:

> (1) the inflammatory or noninflammatory nature of the publicity; (2) the degree to which the publicity was circulated throughout the community; (3) the length of

time elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the difficulty encountered in the selection of the jury; (5) the familiarity of prospective or trial jurors with the publicity and the resultant effect upon them; (6) the challenges exercised by the defendant in selecting the jury, both peremptory and for cause; (7) the connection of government officials with the release of publicity; (8) the severity of the charge; and (9) the size of the area from which the venire is drawn.

*State v. Jeffries*, 105 Wn.2d 398, 409, 717 P.2d 722, *cert. denied*, 107 S. Ct. 328 (1986).

Here, some of the factors weighed in favor of a change of venue. Some of the newspaper publicity was inflammatory and, to a degree, it was inconsistent with the evidence actually presented at trial. The pretrial publicity was disseminated in The Columbian, the primary newspaper in Clark County, which has a daily circulation of 45,071. Many of the articles had prominent placement in the newspaper, and we assume that they were widely read in Clark County. Furthermore, the publicity began 2 days after the incident and continued to the trial date about 3 months later. The record shows also that the county coroner and prosecuting attorney were connected to the release of some of the publicity.

On the other hand, as the State points out, the evidence presented at trial was much more disturbing than the newspaper accounts of the incident. In addition, the jury was selected from the registered voters of Clark County, which, in 1985, had a population of 203,400. Extensive questioning of the prospective jurors revealed that, notwithstanding the extensive publicity, many had only vague recollections of the case. Furthermore, the trial judge exercised extreme care in selecting the jury. He personally interviewed the prospective jurors who had been exposed to pretrial publicity outside the presence of the other jurors. The jurors who were ultimately selected to serve assured the judge and counsel that they could base their decisions

on the evidence presented in court. Finally, although Toennis used all of his peremptory challenges, the trial court granted all of Toennis's challenges for cause to those jurors who indicated that they would have difficulty disregarding the pretrial publicity or their personal opinions. On balance, the trial court did not abuse its discretion in denying the motion. Neither can we say that Toennis has demonstrated that a probability of prejudice existed. Although we have concerns about the degree of pretrial publicity that attended this case and the fact that public officials were connected with the release of some of the publicity, we find that the care taken by the trial court in selecting the jury eliminated the possibility of prejudice. The trial court did not err in denying Toennis's motion for change of venue.[6]

## II
### CHALLENGES FOR CAUSE

Toennis next argues that the trial court erred in not granting certain of Toennis's challenges to jurors for cause.[7] We disagree.

█ A juror may be excused for cause if the court is satisfied that "the challenged person cannot try the issue impartially and without prejudice to the substantial rights

---

[6]As a subargument, Toennis also contends that the governmental misconduct connected with the dissemination of information produces an independent ground for a change of venue. Toennis did not, however, raise this as a separate issue at trial, and generally, alleged prosecutorial misconduct cannot be raised for the first time on appeal. *State v. Weygandt*, 20 Wn. App. 599, 605, 581 P.2d 1376 (1978), *review denied*, 91 Wn.2d 1024 (1979); RAP 2.5(a). Furthermore, as we have noted above, involvement of public officials in the dissemination of pretrial publicity is one of the factors to be considered in ruling on a change of venue motion. *State v. Jeffries, supra.* As noted above, we have considered it in our analysis.

[7]As noted above, only one of the jurors whom Toennis challenged for cause remained on the jury. Toennis used his peremptory challenges, however, to excuse jurors whom the trial court refused to remove for cause. When valid reasons exist to excuse a juror for cause, the fact that the same juror is ultimately removed by a peremptory challenge does not obviate the error, if the defendant is forced unjustifiably to exhaust his peremptory challenges. *See, e.g., State v. Parnell*, 77 Wn.2d 503, 508, 463 P.2d 134 (1969).

of the party challenging, . . . ." RCW 4.44.170(2). Here, the trial court denied Toennis's challenges for cause to several jurors who, although they had been exposed to some pretrial publicity, assured the court that they would base their decisions solely on the evidence presented in court. In light of these assurances, it cannot be said that the trial court erred in denying Toennis's challenges for cause.

## III
### BATTERED CHILD SYNDROME

Toennis assigns error to the trial court's admission of expert testimony on the battered child syndrome.

■ The admission of expert testimony rests within the sound discretion of the trial court. *State v. Black,* 46 Wn. App. 259, 262, 730 P.2d 698 (1986). The battered child syndrome is a well recognized medical diagnosis that generally is not within the common knowledge of jurors. *State v. Mulder,* 29 Wn. App. 513, 515, 629 P.2d 462 (1981). We agree with the court in *Mulder* that a qualified physician may testify that within reasonable probabilities, a particular injury or group of injuries to a child is not accidental or is not consistent with the defendant's explanation, but is instead consistent with physical abuse by a person of mature strength. *Mulder,* 29 Wn. App. at 515. Although it has been argued that this testimony usurps the function of the jury, we disagree. The jury must still decide whether the particular injury in question was caused by the defendant. *Mulder,* 29 Wn. App. at 516.

Nevertheless, a trial court judge must carefully weigh the probative value of such testimony against prejudice to the defendant. ER 403; *Mulder,* 29 Wn. App. at 516. Here, the trial court properly ruled that if the proper foundation was established, the doctor could testify concerning the battered child syndrome to explain the continuing nature of the abuse and to rebut any inference of accidental injury. The trial court did not err in admitting the evidence.

## IV
### ADMISSION OF EVIDENCE OF PRIOR BAD ACTS

According to Toennis, the trial court abused its discretion in admitting, pursuant to ER 404(b), evidence of his prior abuse of Jason. He argues that the evidence was not relevant and was prejudicial.

ER 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of . . . intent . . . or absence of mistake or accident.

The trial court must, of course, first determine if the evidence is logically relevant to a material issue before the jury. *State v. Robtoy*, 98 Wn.2d 30, 42, 653 P.2d 284 (1982). Next, the trial court must determine if the probative value of that evidence outweighs its potential for prejudice. *Robtoy*, 98 Wn.2d at 42. A trial court's decision will be reversed only for an abuse of discretion. *Robtoy*, 98 Wn.2d at 42.

██ If the defendant admits doing the act with which he currently is charged, but claims that he did not have the requisite state of mind, evidence that the defendant has previously mistreated a child may be relevant and necessary to prove an essential ingredient of the State's case. *State v. Mercer*, 34 Wn. App. 654, 660, 663 P.2d 857 (1983). The probative value of this evidence is especially great in cases in which the best witness, the victim of the current offense, is unable to testify because of his death. *State v. Mills*, 39 Or. App. 85, 591 P.2d 396, 398 (1971).

Here, Toennis admitted that he struck Jason the day he died. However, he denied that he repeatedly struck Jason. In addition, Toennis implied that some of Jason's injuries had occurred because of falls, rather than because Toennis had beaten him. Because the State had to prove that Toennis *knowingly* inflicted grievous bodily harm upon

Jason,[8] the evidence of prior beatings was relevant to show that Jason was in an obviously battered condition, which should have put Toennis on notice that additional blows could result in grievous bodily harm to Jason.

Toennis also contends that the evidence of the prior abuse was inadmissible because the State had not sufficiently connected these acts with Toennis. We disagree.

■ Generally, in addition to meeting the requirements of ER 404(b), the State must prove both prior acts, and the defendant's connection to these acts, by a preponderance of the evidence. *State v. Tharp*, 96 Wn.2d 591, 594, 637 P.2d 961 (1981). Here, the State met this standard of proof. The neighbor and acquaintances who testified about Toennis's prior acts were either eyewitnesses or had heard Toennis admit abusing the child. Although Toennis did not admit breaking Jason's arm, and there was no direct evidence that he committed that act, a witness testified that Toennis kicked Jason so hard that he fell down on several occasions. The jury could have believed that these acts caused Jason to break his arm. In our judgment, the State met its burden.

V

ADMISSION OF PHOTOGRAPHS OF THE VICTIM

■ Finally, Toennis contends that the trial court erred in admitting photographs of the victim. Admission of photographs rests within the sound discretion of the trial court. *State v. Little*, 57 Wn.2d 516, 519, 358 P.2d 120 (1961).

---

[8]Toennis was charged with murder in the second degree under RCW 9A.32-.050(1)(b) by causing a death in the course of a felony—in this case assault in the second degree. RCW 9A.36.020.

RCW 9A.36.020 (effective until July 1, 1988) provided, in pertinent part:

(1) Every person who, under circumstances not amounting to assault in the first degree shall be guilty of assault in the second degree when he:

. . .

(b) Shall knowingly inflict grievous bodily harm upon another with or without a weapon; . . .

188

"Even repulsive photographs are admissible if their probative value outweighs their prejudicial effect." *State v. Sargent,* 40 Wn. App. 340, 347, 698 P.2d 598 (1985). In *State v. Sanchez,* 42 Wn. App. 225, 231–32, 711 P.2d 1029 (1985), *review denied,* 105 Wn.2d 1008 (1986), the court held that photographs of the victim, showing injuries and position of her clothing, were relevant to show the force of impact.

Toennis contends that the trial court erred in admitting any of the photos of the injured portions of Jason's body. We disagree, concluding that the trial court properly exercised its discretion. It excluded many photographs that were merely cumulative, and it admitted only those photographs that would assist the jury in determining the nature and extent of Jason's injuries. Although the photographs that were admitted were disturbing, this was a disturbing case. In our opinion, the jury could not be fully informed about the incident and, at the same time, be insulated from the realities of the child's death. The photographs were relevant to the issues in the case, and the trial court did not err in admitting them.

We affirm.

REED, C.J., and PETRICH, J., concur.

Review denied by Supreme Court November 29, 1988.