[No. 20732-6-I. Division One. April 24, 1989.]

THE STATE OF WASHINGTON, *Respondent*, v. JARY RONALD CRUTCHFIELD, *Defendant*, TIMOTHY DAVID GRANT, *Appellant*.

*Helen A. Anderson* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Daniel Satterberg* and *William L. Downing, Deputies,* for respondent.

WINSOR, J.—Timothy David Grant challenges his 90–month exceptional sentence for first degree manslaughter. Under the Sentencing Reform Act of 1981 (SRA), RCW 9.94A, the presumptive range for this crime is 31 to 41 months. Grant contends that the trial court relied on unsupported and improper findings to enhance his sentence. We agree that most of the court's findings are defective, and reverse and remand for resentencing.

On July 23, 1985, R. became concerned about Joyce Grant, whose marriage to defendant Timothy Grant was in

trouble. R.'s boyfriend told her Joyce had probably left Grant, so R. phoned the Grants' apartment to see whether Joyce was there. Grant answered the phone and indicated to R. that Joyce was at home and she should come to the apartment if she wished to speak with Joyce. When R. arrived at Grant's apartment, she discovered that Joyce was not there. In fact, Grant had no idea where his wife was.

R., Grant, and Grant's friend, Jary Ronald Crutchfield, went to an upstairs bedroom where Crutchfield began asking R. for information about Joyce. When R. replied that she did not know, Crutchfield brought out a gun and held it to R.'s head. During this exchange, Grant sat at a desk a few feet away, measuring and cutting cocaine. Grant noticed the gun, pushed it away from R.'s head and told Crutchfield to knock it off. Crutchfield left the room. Grant calmed R. down by telling her that Crutchfield, whom she had never met before, was "full of hot air." This was contrary to Grant's knowledge of Crutchfield's violent reputation. R. and Grant then ingested some cocaine.

Crutchfield returned to the room, unnoticed by Grant who had resumed cutting and measuring the cocaine. Grant's attention was drawn by an "undescribable noise." He turned around and saw Crutchfield sitting on the bed, with R. in front of him. An extension cord was wrapped around R.'s neck. Grant grabbed his gun and pointed it at Crutchfield. Grant claims that he told Crutchfield to "stop or I'll shoot." At this point, Crutchfield's friend, Clayton Lewis, entered the bedroom. Lewis pulled a gun, aimed it at Grant and ordered Grant to put his gun down. Grant complied.

Crutchfield laid R. on the bed. He got on top of R. and put his hands round her throat. R. let out a last wheeze of air. Crutchfield then struck R. across the throat several times. R.'s body was placed in a sleeping bag, bound with electrical wire, and hidden in the laundry room.

At about 5:30 a.m., R.'s boyfriend arrived at Grant's apartment looking for R. Grant told him that earlier there had been a knock at the door, that R. answered it and left

with the callers. R.'s boyfriend waited for an hour or so for R. to return before he left.

Grant and Crutchfield put R.'s body into Grant's fold–out sleeper sofa. They loaded the sofa into a pickup truck and drove to Crutchfield's property in Mason County. They then removed R.'s body from the sofa and carried it to a beaver pond.

Over the next 16 months R.'s disappearance was a mystery and the subject of an investigation by the Bellevue Police Department and Detective John Hansen. Detective Hansen interviewed Grant on August 13, 1985, at the Bellevue police station. Grant told Hansen the lie about R. leaving his apartment with some unknown person. Grant repeated this story to R.'s family and friends.

The investigation into R.'s disappearance broke in November 1986, when Lewis was served with a subpoena to appear before a special inquiry judge. In return for a grant of immunity, Lewis told the police he had seen Crutchfield kill R. Lewis led a search team to the beaver pond where R.'s body was found chained to a submerged log.

Grant and Crutchfield were charged in the alternative with first and second degree murder for causing the death of R. The trials of the codefendants were severed, and Grant was tried by a jury. He was convicted of the lesser included crime of manslaughter in the first degree, RCW 9A.32.060.

On June 15, 1987, the sentencing judge imposed an exceptional sentence of 90 months. He gave eight reasons in support of the exceptional sentence:[1]

1. Grant was a friend of the victim and he abused her trust by intentionally luring her over to his apartment, which led to her death;

---

[1] The sentencing judge entered written findings of fact to justify the exceptional sentence. Several of the written findings are ambiguous. We therefore look to his oral opinion for clarification. *See, e.g., Schoonover v. Carpet World, Inc.,* 91 Wn.2d 173, 177–78, 588 P.2d 729 (1978); *Port Townsend Pub'g Co. v. Brown,* 18 Wn. App. 80, 85, 567 P.2d 664 (1977).

2. Grant increased the victim's vulnerability by giving her more drugs after she was threatened with a gun by Crutchfield;

3. Grant was engaged in drug dealing;

4. Grant's inaction during the strangling was attributable to his selfish preoccupation with his drug business;

5. Grant assisted in the cover–up of the crime by transporting and concealing the body;

6. Grant's false statements to the victim's parents, sister, and boyfriend were made deliberately and served to exacerbate and prolong their anguish;

7. Grant's conduct throughout the incident was far beyond that typically associated with a conviction for manslaughter in the first degree;

8. Grant is likely to earn good time in prison which will reduce the amount of time he will actually serve.

Grant contends that: reasons 1, 2, 6 and 7 are not supported by the record; reasons 3 and 5 violate the "real facts" doctrine, RCW 9.94A.370; as to 4, his inaction during the strangling was taken into account in computing the presumptive range for first degree manslaughter; further as to 5, he assisted in the cover–up of the crime out of fear of Crutchfield; as to 6, a crime's impact on third parties is not a proper aggravating factor; reason 7 impairs his constitutional right to jury trial; and as to 8, a sentencing judge may not consider the possibility of good time.

In reviewing an exceptional sentence, this court must first determine whether the trial court's reasons are supported by the record. RCW 9.94A.210(4); *State v. McAlpin,* 108 Wn.2d 458, 462, 740 P.2d 824 (1987); *State v. Nordby,* 106 Wn.2d 514, 517, 723 P.2d 1117 (1986). Because this is a factual question, the sentencing judge's reasons will be upheld if they are not "clearly erroneous." *McAlpin,* 108 Wn.2d at 462; *Nordby,* 106 Wn.2d at 517–18. Second, the reviewing court must independently determine whether, as a matter of law, the trial court's reasons justify an exceptional sentence. RCW 9.94A.210(4)(a); *McAlpin,* 108 Wn.2d

at 463; *Nordby*, 106 Wn.2d at 518. There must be "substantial and compelling" reasons for imposing such a sentence. RCW 9.94A.120(2); *McAlpin*, 108 Wn.2d at 463.

The drafters of the SRA realized that not all factual patterns could be anticipated, and that a common law of sentencing would develop. *See Nordby*, 106 Wn.2d at 516; D. Boerner, *Sentencing in Washington* § 9.3 at 9–10 (1985). An illustrative list of aggravating circumstances is contained in RCW 9.94A.390(2); this list is not an exclusive compilation of what constitutes "substantial and compelling reasons." *McAlpin*, 108 Wn.2d at 463. We are, however, still in the early years of interpreting the SRA, and we find it important to keep in mind Professor Boerner's admonition:

> [I]t is important that judges realize that expanding the number and scope of approved aggravating circumstances is potentially at odds with the underlying principles of proportionality and culpability.

D. Boerner, at 9–48.

### REASON ONE: ABUSE OF TRUST

The record in this case provides a factual basis for the court's finding that there was a relationship of trust. Grant knew R. for 5 to 6 months and was her friend. Grant lied to R. to induce her to visit his apartment on the night of her death. Grant knew of Crutchfield's violent propensities, and yet, when Crutchfield threatened R. with a gun, Grant soothed R. by telling her that Crutchfield was "full of hot air."

As to whether this reason legally justifies an exceptional sentence, the SRA's list of aggravating circumstances expressly includes breach of trust if the crime was a "major economic offense." A sentence is properly enhanced where "[t]he defendant used his or her position of trust, confidence, or fiduciary responsibility to facilitate the commission of the current offense." RCW 9.94A.390(2)(c)(iv). Economic offenses (fraud, theft by deception, etc.) are crimes of intent.

Exceptional sentences have been sustained on the ground that the defendant abused the victim's trust in two cases involving noneconomic offenses: *State v. Davis*, 47 Wn. App. 91, 95, 97–98, 734 P.2d 500 (defendant, who had been painting the victim's house a short time before the assault, used his position of trust to get the victim to open her front door to allow him entry immediately before the assault), *review denied*, 108 Wn.2d 1029 (1987); and *State v. Harp*, 43 Wn. App. 340, 342–43, 717 P.2d 282 (1986) (defendant used his position of trust as the caretaker for the children to molest them). Both cases involve crimes of intent and fit the language of the statute in that the "defendant used [his] position of trust . . . to facilitate the commission of the . . . offense." RCW 9.94A.390(2)(c)(iv).

■ Our case is distinguishable from *Davis, Harp,* and the statute, in that Grant was convicted of a crime permitting a lower degree of culpability: recklessness. Indeed, by acquitting him of first or second degree murder, the jury rejected the State's contention that Grant acted intentionally. A person who acts recklessly does not intend to commit the offense, and therefore, Grant's reassuring R. was not (in the language of the statute) done "to facilitate" the offense. RCW 9.94A.390(2)(c)(iv).

The trial court erred in using this ground.

REASON TWO: VICTIM VULNERABILITY

Grant claims that there was no evidence that R., who was 26 years old, was incapacitated by her voluntary use of cocaine or that it rendered her unable to resist Crutchfield. The SRA provides that the trial court may consider that "[t]he defendant knew or should have known that the victim of the current offense was particularly vulnerable or incapable of resistance due to extreme youth, advanced age, disability, or ill health", in the exercise of its discretion to impose an exceptional sentence. RCW 9.94A.390(2)(b).

■ We agree with Grant that there is no evidence that R. was impaired by her cocaine use. Therefore, the trial

court erred in using vulnerability. *Compare State v. Johnston*, 390 N.W.2d 451 (Minn. Ct. App. 1986) (finding that victim, whose blood alcohol level was .24, was particularly vulnerable was not supported where the record did not contain enough evidence to determine whether his intoxication was a substantial factor in the defendant's assault) *with State v. Gettel*, 404 N.W.2d 902 (Minn. Ct. App. 1987) (exceptional sentence upheld where a 13–year–old rape victim became intoxicated and either fell asleep or passed out before defendant had sexual intercourse with her).

### REASON THREE: ILLICIT DRUGS

It is clear from the record that cocaine permeated the events in this case. Grant, Crutchfield, and the victim had all ingested cocaine shortly before Crutchfield strangled R. Grant admitted in court that he was an active dealer of cocaine. He was actually cutting cocaine when R. was strangled. The question is whether the presence of illicit drugs can legally justify an exceptional sentence.

Grant was not charged with any drug related offenses. The SRA bars the court from considering unproven or uncharged crimes as a reason for imposing an exceptional sentence. RCW 9.94A.370(2) provides that:

> In determining any sentence, . . . [f]acts that establish the elements of a more serious crime or additional crimes may not be used to go outside the presumptive sentence range except upon stipulation or when specifically provided for in RCW 9.94A.390(2)(c), (d), and (e).[2]

█ The policy behind the statute is one of fairness. "Defendants will be held accountable for what they have been convicted of, but not for crimes that the prosecution either could not or chose not to prove." (Italics omitted.) *McAlpin*, 108 Wn.2d at 466 (quoting D. Boerner, at 9–49 to 9–50). This concept is also applicable here, where Grant

---

[2]RCW 9.94A.390(2)(c) applies to convictions for a major economic offense. RCW 9.94A.390(2)(d) applies to convictions for a major violation of the Uniform Controlled Substances Act, RCW 69.50. RCW 9.94A.390(2)(e) applies when the current offense is part of an ongoing pattern of sexual abuse.

himself voluntarily testified to conducting a cocaine business. *McAlpin,* at 466–67. Therefore, the presence of illicit drugs may not be used to justify an exceptional sentence in this case.

### REASON FOUR: INACTION

The trial court stated that one of the appalling aspects of this case was the absolute disregard for the danger of cocaine and what it does to people. Grant testified that he did not notice that Crutchfield had reentered the bedroom until R. cried out because he was "real intent" on cutting the cocaine. The trial court found Grant's response during the strangling to be totally unreasonable, and probably induced by his "selfish preoccupation with his drug business."

The court, however, may not consider Grant's inactivity as to R.'s plight and preoccupation with his drug business as a basis for imposing an exceptional sentence. One of the elements of first degree manslaughter is recklessness. RCW 9A.32.060. A person acts recklessly when he knows of and disregards a substantial risk that a wrongful act may occur. RCW 9A.08.010(1)(c). Hence, Grant's recklessness in his preoccupation with his drug business was already accounted for in determining the presumptive range for first degree manslaughter; it cannot be counted a second time to justify an exceptional sentence. *State v. Dunaway,* 109 Wn.2d 207, 218, 743 P.2d 1237, 749 P.2d 160 (1987).

### REASON FIVE: CONCEALMENT

The record amply supports the trial court's finding that Grant assisted in the cover–up of the crime by transporting and concealing the body. Grant contends he assisted Crutchfield in hiding the body out of fear of Crutchfield. He argues that an exceptional sentence should not be imposed for acts done under duress, and that this is a *mitigating* factor. *See* RCW 9.94A.390(1)(c).

We believe that the trial judge properly rejected the existence of duress as a mitigating factor because: Grant

was interviewed by Detective Hansen outside of the presence of Crutchfield on August 13, 1985; Grant moved to Bethel, Alaska, in October 1985 while Crutchfield remained in Seattle; and Grant's alleged fear of Crutchfield did not prevent him from seeking out Crutchfield to collect a backgammon debt shortly before Grant moved to Alaska. *See State v. Altum,* 47 Wn. App. 495, 505, 735 P.2d 1356 (1987). Considering the record, one cannot say that no reasonable person would have rejected Grant's argument that he acted under duress. *See State v. Fisher,* 108 Wn.2d 419, 739 P.2d 683 (1987).

Grant also argues that the concealment of the murder establishes the elements of the additional crime of rendering criminal assistance, RCW 9A.76.070,[3] and therefore should not have been considered as an aggravating factor to increase a sentence beyond the standard range. RCW 9.94A.370(2). We agree.

■ Additionally, we agree with Professor Boerner who points out that the net effect of allowing concealment to be an aggravating factor in the ordinary case is to punish the defendant for not disclosing the location of the victim's body. If Grant had disclosed it, it would surely have incriminated him. Thus, by ruling that concealment can be an aggravating factor, we would be holding that the defendant who exercises his constitutional right not to incriminate himself by refusing to reveal the location of the victim's body has thereby operated to increase his own punishment. D. Boerner, at 9–45 to 9–47. Reprehensible as

---

[3]RCW 9A.76.070 provides:

"(1) A person is guilty of rendering criminal assistance in the first degree if he renders criminal assistance to a person who has committed or is being sought for murder in the first degree or any class A felony or equivalent juvenile offense.

"(2) Rendering criminal assistance in the first degree is:

"(a) A gross misdemeanor if it is established by a preponderance of the evidence that the actor is a relative as defined in RCW 9A.76.060;

"(b) A class C felony in all other cases."

the behavior of the defendant is, the exercise of a constitutional right should not be used as a reason for departure from the standard range.

### REASON SIX: IMPACT ON OTHERS

The record clearly establishes that Grant repeatedly lied to R.'s family members during the 16 months that R. was missing. Grant told R.'s parents, sister, and boyfriend that R. had left with some unknown friends. He also told R.'s mother that R. had done some undercover work and that she had been threatened and was frightened when he last saw her.

The SRA provides an opportunity for victims or their survivors to testify regarding the crime's impact on them at the sentencing hearing. RCW 9.94A.110; RCW 7.69.030(11), (12). The Legislature intended the sentencing court to consider a crime's impact on victims and their survivors. *See* RCW 7.69.010; 7.69.020(4); 7.69.030(10), (11), (12). Presumably, the victim's or survivor's testimony will be evaluated along with the other evidence presented at the sentencing hearing to determine what sentence will be imposed.

Whether the impact of Grant's conduct on R.'s family is an appropriate aggravating factor for an exceptional sentence is a question of first impression in Washington, but is one that has been addressed by the Minnesota court. Minnesota cases on sentencing are persuasive authority in Washington. *State v. Falling,* 50 Wn. App. 47, 55, 747 P.2d 1119 (1987); *Nordby,* 106 Wn.2d at 521 n.5 (Utter, J., dissenting). The Minnesota Supreme Court has approved the use of a crime's impact on persons other than the victim as an aggravating factor. *See, e.g., State v. Broten,* 343 N.W.2d 38, 41 (Minn. 1984) (the impact of an arson of a law office, restaurant and newspaper on the "clients of the lawyer, the patrons of the restaurant, and the readers of the newspaper" was held to be an appropriate aggravating circumstance); *State v. Profit,* 323 N.W.2d 34, 36 (Minn. 1982) (crime committed in the presence of children).

▮ Professor Boerner cautions, however, that

[t]he use of the crime's impact on persons not present during its commission is troublesome on two grounds. First, it raises the question as to whether it is a factor that truly distinguishes one crime from another of the same class. All serious crimes have consequences beyond the victim, and this raises the issue of whether the presence of these effects are "of a kind not normally associated with the commission of the offense in question."

. . .

The second troublesome aspect of considering the impact on third persons is the potential tension between such consideration and the fundamental principle of blameworthiness. Considering impacts beyond those immediately surrounding the crime raises issues of the justness of imposing punishment based upon either unforeseen or unforeseeable consequences. For example, would it be appropriate to aggravate the punishment for a crime otherwise indistinguishable from all others of the same class because the victim's spouse, although not present during the crime, suffered severe emotional distress upon learning of the crime?

(Footnote omitted.) D. Boerner, at 9–47 to 9–48. These concerns are well founded. We therefore limit the application of this aggravating factor to cases where the defendant's actions have an impact on others of such a distinctive nature that it is not normally associated with the commission of the offense in question *and* where the impact is foreseeable to the defendant.

Both factors are present in the current case. R.'s parents did not know the fate of their daughter for 16 months. This is an emotional trauma not normally associated with manslaughter. The defendant knew that R. lived with her parents, and he was acquainted with them prior to R.'s death. Grant's lies regarding R.'s disappearance added to her parent's anguish.[4] Reason six supports the trial court's imposition of an exceptional sentence.

---

[4]An exceptional sentence may be imposed for telling falsehoods without violating Grant's constitutional right not to incriminate himself. The Fifth Amendment permits an individual to refuse to answer questions, but it does not give him or her the right to answer falsely. *United States v. Apfelbaum*, 445 U.S. 115, 132, 63 L. Ed. 2d 250, 100 S. Ct. 948 (1980) (Brennan, J., concurring in judgment).

## Reason Seven: Atypical Facts

Grant was convicted of recklessly causing the death of R. The trial judge found that Grant's conduct exceeded that typically associated with a conviction for manslaughter in the first degree. Grant contends that this finding shows the trial judge's unacceptance[5] of the jury's verdict acquitting him of first and second degree murder. Grant argues that this finding amounts to a judgment notwithstanding the verdict, denying Grant the benefit of his constitutional right to a jury trial.

In appropriate cases, if the defendant's conduct was well beyond the conduct typically associated with the crime for which he was convicted, but did not establish other crimes, an exceptional sentence may be justified. *State v. Ratliff,* 46 Wn. App. 466, 731 P.2d 1114 (1987); D. Boerner, at 9-10 to 9-13.

Until the SRA was enacted, and traditionally, sentencing judges could consider any information concerning a defendant's criminality, regardless of whether it resulted in a conviction. *Williams v. New York,* 337 U.S. 241, 93 L. Ed. 1337, 69 S. Ct. 1079 (1949); *State v. Blight,* 89 Wn.2d 38, 569 P.2d 1129 (1977). The practice of determining the sentence with reference to the judge's belief as to the offender's actual behavior, rather than being confined to the charge he was convicted of, is known as "real offense" sentencing.

---

[5]In his oral opinion, the trial judge stated:

"I don't know what the jury believed, but I know they obviously had problems with regard to who to believe, who not to believe in the testimony. I don't think that their verdict necessarily says that Mr. Grant did not act in a way that was nontypical for a first degree manslaughter charge. At the minimum, they found his conduct was with reckless disregard for the safety of Ms. [R.]. That is the minimum they found. They may have thought—the majority might have thought otherwise. Who knows what they thought? The verdict is supported by the evidence, but so would a charge of murder in the second or first degree be supported by the evidence.

". . . It demands an exceptional sentence because of . . . the real probability that he may have done more than just been involved in [recklessness]."

> Tribunals passing on the guilt of a defendant always have been hedged in by strict evidentiary procedural limitations. But both before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law. . . .
>
> . . . In a trial before verdict the issue is whether a defendant is guilty of having engaged in certain criminal conduct of which he has been specifically accused. . . . A sentencing judge, however, is not confined to the narrow issue of guilt.

(Footnotes omitted.) *Williams*, 337 U.S. at 246–47.

The Sentencing Guidelines Commission debated the propriety of this practice at length and rejected it.

> Its belief was that, regardless of the legality of the practice of real–offense sentencing, it was fundamentally wrong and inconsistent with the principles underlying our system of justice to sentence a person for crimes the state either could not or chose not to prove.

D. Boerner, at 5–2. The Commission's solution was adopted intact by the Legislature and resulted in passage of RCW 9.94A.370.[6]

█ The trial court's finding was apparently based on the judge's belief that Grant acted knowingly or intentionally in causing R.'s death. This practice is barred by the statute and what Professor Boerner describes as the "real facts" doctrine. D. Boerner, at 5–3. We need not reach the constitutional issue.

### REASON EIGHT: GOOD TIME

The judge explained his 7½–year sentence, noting the defendant would probably get good time credit equal to one–third of the sentence. He said that Grant has the intelligence and ability to behave himself in confinement and get good time, and he did not believe that the resulting

---

[6]Discussed at Reason Three: Illicit Drugs.

5 years of actual confinement was unreasonable. The sentencing judge stated that 5 years is the very least that society can expect under these circumstances.

 The judge erred.

To the extent that the judge relied on [the availability of good time] to impose [an] exceptional [sentence], such reliance was improper. The framework of the SRA indicates that earned early release time is to be considered only after the offender has begun serving his sentence. *See* RCW 9.94A.150(1). Moreover, it would be inappropriate to impose a sentence outside the presumptive range based on an entirely speculative prediction of the likely behavior of an offender while in confinement.

*Fisher,* 108 Wn.2d at 429 n.6.

### CONCLUSION

 Because we have invalidated seven of the eight reasons given by the trial judge in justifying the exceptional sentence, we believe that a remand is required, especially in light of the great disparity between the 90–month sentence imposed and the 36–month midpoint of the standard range. This difference is too great for this court to find that the trial judge would still impose the same sentence if he were to consider only the one justifiable reason.[7] *Dunaway,* 109 Wn.2d at 219–20. We therefore remand the sentencing to the trial judge for reconsideration.

COLEMAN, C.J., and WEBSTER, J., concur.

Reconsideration denied June 13, 1989.

---

[7]Where some, but not all, of the court's reasons are invalidated, remand is not always required. *See Fisher,* 108 Wn.2d at 430 n.7. If it is clear from the record that the sentencing judge placed considerable weight on what are valid and substantial reasons, it may be unnecessary to remand. *See State v. Tunell,* 51 Wn. App. 274, 284, 753 P.2d 543, *review denied,* 110 Wn.2d 1036 (1988).