[No. 24406–0–I.   Division One.   December 10, 1990.]

THE STATE OF WASHINGTON, *Respondent,* v. RONALD HAMPTON JONES, *Appellant.*

*Lenell Nussbaum* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Lynn E. Moberly, Deputy,* for respondent.

WINSOR, J.—Ronald Hampton Jones appeals his conviction and sentence for manslaughter in the first degree. He argues that expert opinion evidence on the victim's cause of death improperly invaded the province of the jury, and that the trial court erred in imposing an exceptional sentence based on the vulnerability of the victim. We affirm.

On September 13, 1988, Jones babysat his 4–month–old son, Kaylon, while his wife Phyllis was at work. Kaylon

appeared normal and healthy when Phyllis left for work. Jones called Phyllis around 4:15 p.m., however, and reported that Kaylon had stopped breathing.

Medics arrived at the Jones' residence sometime around 4 p.m., but were unable to revive the infant. When the medics left the scene, they believed the cause of death to be Sudden Infant Death Syndrome (SIDS). While examining Kaylon's body the next day, however, Dr. Schmunk, an assistant medical examiner for King County, noticed that the child had a bump on the side of his head. He also noticed bruising on Kaylon's back. Upon performing an autopsy, Dr. Schmunk discovered internal bleeding beneath the scalp and a complex skull fracture. Dr. Schmunk determined that the skull fracture was the cause of Kaylon's death.

Two days after Kaylon's death, Jones was questioned by a Seattle police detective. At first, Jones stated that he had put Kaylon down for a nap in the afternoon. When Jones went in to check on him about a half–hour later, Kaylon had stopped breathing. Jones also stated that Kaylon may have hit his head the week before as a result of his older brother pushing him off the couch.

While questioning Jones, the police interviewer learned of the medical examiner's conclusion that Kaylon died as a result of a complex skull fracture. When informed of this conclusion, Jones changed his story. Jones then told the interviewer that he had yanked Kaylon out of a baby swing in an effort to make him stop crying, and accidentally bumped the baby's head on the iron top bar of the swing.

Police recovered the swing from Jones' residence and showed it to Dr. Schmunk as well as Dr. Reay, the Chief King County Medical Examiner, and Dr. Ken Feldman, a pediatrician who specializes in child abuse cases. After examining the swing, all opined that the severity of Kaylon's injury was inconsistent with Jones' explanation. Jones was charged with first degree manslaughter.

At trial, the State called Dr. Schmunk, Dr. Feldman, and Dr. Reay to testify. Over a defense objection, Dr. Feldman

testified that in his opinion, the injury was "a non–accidental blunt injury." He further explained how he arrived at that conclusion:

> Whenever we are making the judgment, we look at two things: the history of the injury and the injury itself, and whether the history explains the trauma we see or not.
>
> In this case, we're not offered any plausible historical evidence or plausible historical data for the injuries received, and the characteristics of the injury are very impressive, very discrete, and if there had been a history to explain it, it would have been a very obvious accidental history.

Dr. Feldman also stated his reasons for disbelieving Jones' story that the injury resulted from the swing:

> [O]ne is that this history wasn't derived until after the defendant was aware that the child had died of blunt impact. It wasn't revealed initially.
>
> Number two: If an infant who was angry and struggling, such as this child was, was lifted from the swing, chances are the legs would have hung up and something that top–heavy would have tipped over rather than the child coming up out of it and striking the top.
>
> Number three: To lift a child out of there is a position of mechanical disadvantage. It's hard to get a lot of inertia in lifting something out of the swing. I guess we're up to about four. If the child in fact had come free of there and had been lifted, the swing itself has very little mass, and we know that injuries of this type require a great deceleration, velocity striking the immovable mass. That is not an immovable mass.
>
> . . . .
> . . . Number five, I guess: If the child had been lifted out—a child that age does not have much neck tone. One would have expected the head to have flopped forward. The point of impact would likely have been about the crown. This child's point of impact was far on the side, so the head would have had to have fallen acutely off to the side. Unusual position to occur for an injury like that.
>
> Six: There are sharp surfaces there. Everything was un–unique. The scalp—if the child had struck that with force, likely there would have been some surface evidence of trauma where the line of the swing struck the child. And in sum, there just isn't enough force—the types of injuries that cause this sort of fracture, this sort of head injury, require much greater force than you could have ever generated with an accident scenario like that.

He also testified that Kaylon's fracture could not have occurred as a result from a fall from a bed or couch, but

instead would have to have resulted from a force equivalent to a 6– or 8–foot fall onto a hard surface or an automobile accident.

Dr. Feldman also discounted the possibility that Kaylon had received the injury prior to the day of his death. He opined that an impact rendered Kaylon unconscious and that he stayed unconscious until his death shortly thereafter.

Dr. Reay also testified. He, too, opined that the injury was inflicted, stating:

> The nature of the injury is such that this injury could only really be sustained by some sort of inflicted manner, whether it be an object, including a hand or a fist or some other object. I think the usual activity that a four–month–old child would experience would not expose him to that kind of injury.

Dr. Reay also testified that unconsciousness probably occurred shortly after impact, and that death probably occurred within 10 to 15 minutes after impact.

The jury was instructed on both first and second degree manslaughter, as well as excusable homicide. Jones was convicted of first degree manslaughter. The court imposed an exceptional sentence of 82 months, twice the upper standard range, based on the following finding: "The victim being only 4 months old left in the sole custody of the defendant was particularly vu[l]nerable & helpless."

## I
### EXPERT TESTIMONY

Jones first argues that by allowing Dr. Feldman and Dr. Reay to testify that they believed the injury to be inflicted, the trial court allowed improper opinion evidence of guilt and credibility. He further contends that it was only their dissatisfaction with his explanation of the cause of the injuries which led them to that conclusion. The result of this improper evidence, Jones concludes, is that the testimony invaded the jury's role as the judge of credibility. He relies on *State v. Black,* 109 Wn.2d 336, 348, 745 P.2d 12 (1987) and *State v. Fitzgerald,* 39 Wn. App. 652, 694 P.2d 1117 (1985).

In *Black,* an expert witness testified to the existence of a specific profile of symptoms exhibited by rape victims, known as the rape trauma syndrome. The expert also specifically testified that the victim in that case fit the profile. 109 Wn.2d at 339. In reviewing the propriety of admission of that evidence, the Supreme Court found that the rape trauma syndrome was not a scientifically reliable means of proving lack of consent in a rape case, and the expert's testimony that the victim fit the profile invaded the province of the jury. An expert's opinion that the victim suffered from rape trauma syndrome, in essence, improperly told the jury that the victim was telling the truth. 109 Wn.2d at 348–50.

In *Fitzgerald,* an expert physician testified that, based on her interview with two complaining witnesses, she believed they had been molested. The appellate court disapproved of the testimony because the expert's opinion on the ultimate issue of fact was based solely on the credibility of the witnesses. 39 Wn. App. at 656–57.

Both *Black* and *Fitzgerald* are distinguishable from this case because in both, experts testified directly on their opinions of the veracity of sexual abuse victims. As in most sex cases, credibility of the victim was the crucial issue because the testimony of the victim(s) and the defendant was in direct conflict. *See Black,* 109 Wn.2d at 338; *Fitzgerald,* 39 Wn. App. at 657. The fatal problem in both *Black* and *Fitzgerald* was that the experts, in essence, directly stated that the defendant was guilty. *Black,* 109 Wn.2d at 349; *Fitzgerald,* 39 Wn. App. at 657. As the court stated in *Fitzgerald,* "'"An expert may not go so far as to usurp the exclusive function of the jury to weigh the evidence and determine credibility."'" 39 Wn. App. at 657 (quoting 5A K. Tegland, Wash. Prac., *Evidence* § 292, at 39 n.4 (2d ed. 1982)).

Here the doctors' opinion that the injury was inflicted, rather than accidental, was not based on their opinion of a witness' credibility, but on inferences drawn from the physical evidence educed at the autopsy. Dr.

Feldman is a child abuse specialist and Dr. Reay is the Chief King County Medical Examiner, responsible for investigating sudden, unexpected and violent death, and determining the cause of death. It is undisputed that both doctors are eminently qualified to analyze the physical evidence and formulate opinions as to the cause of death.[1] Due to the severity of Kaylon's injuries, the doctors both opined that Jones' story regarding the swing was inconsistent with the physical evidence, and that, in the absence of any other obvious accidental history, death was the result of an inflicted blow.

Although the doctors' conclusions touch on the ultimate issue, that in itself does not make the testimony inadmissible. ER 704 provides that "[t]estimony in the form of an opinion or inferences otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." As the federal advisory committee's note to Federal Rule of Evidence 704 indicates, one of the purposes of adoption of ER 704 was to allow qualified witnesses to testify on medical causation. *See State v. Langley*, 354 N.W.2d 389, 401 (Minn. 1984).[2]

The basic approach of the current rules of evidence is to admit expert opinions when helpful to the trier of fact. ER 702; Fed. R. Evid. 704 advisory committee note. Generally, expert evidence is helpful and appropriate when the testimony concerns matters beyond the common knowledge of the average layperson, and does not mislead the jury to the prejudice of the opposing party. *State v. Cunningham*, 23 Wn. App. 826, 854, 598 P.2d 756 (1979), *rev'd on other grounds*, 93 Wn.2d 823, 613 P.2d 1139 (1980); *see United*

---

[1] Indeed, Jones has not disputed the scientific reliability of the doctors' testimony.

[2] Of course, such evidence is also "subject to the limitations of Rules 701 and 702, which require opinions based on personal observation and helpful to the trier of fact, and ER 403's protection against undue influence and misleading the jury." R. Aronson, *Evidence in Washington* 704-3 (1989).

*States v. Winters,* 729 F.2d 602, 605 (9th Cir. 1984); *State v. Ciskie,* 110 Wn.2d 263, 274, 751 P.2d 1165 (1988).

Here the evidence was helpful to the jury: under the facts and circumstances presented, the doctors were better qualified than jurors to adjudge the cause of death and whether the fatal blow was accidental or inflicted. Opinion evidence on these issues is commonly allowed in homicide cases. *See, e.g., Commonwealth v. Pikul,* 400 Mass. 550, 511 N.E.2d 336, 339 (1987) (an expert who has performed an autopsy may testify that injuries observed could have been caused in a particular way or by a specified instrumentality); *State v. Sugar,* 100 N.J. 214, 495 A.2d 90, 105 (1985) (expert opinion that victim died of poisoning proper); *Bethea v. State,* 251 Ga. 328, 304 S.E.2d 713, 716 (1983) (expert testimony that victim's death caused by a blow to abdomen, and not by a fall down the stairs, proper because medical circumstances of death beyond knowledge of average layperson); *Cunningham,* 23 Wn. App. at 854 (expert evidence concluding cause of death was the result of subdural hematoma or repeated physical abuse proper); *Morris v. State,* 266 Ind. 473, 364 N.E.2d 132, 138 (expert opinion that victim died from blows to the head helpful to jury and supported by evidence), *cert. denied,* 434 U.S. 972, 54 L. Ed. 2d 462, 98 S. Ct. 526 (1977).

Moreover, the doctors did not opine that Jones committed the offense; therefore, the jury was still left to decide whether Jones actually inflicted the injury. *Cf. State v. Toennis,* 52 Wn. App. 176, 185, 758 P.2d 539 (admission of expert testimony on battered child syndrome did not usurp function of the jury, where witness indicated that injury was not accidental or consistent with defendant's story), *review denied,* 111 Wn.2d 1026 (1988); *State v. Mulder,* 29 Wn. App. 513, 515–16, 629 P.2d 462 (1981) (same). The jury also had the responsibility of determining the weight to accord the experts' testimony. *Mulder,* 29 Wn. App. at 516. Accordingly, we find that the trial court was within its discretion in admitting the evidence; thus, Jones' conviction is affirmed.

## II
### EXCEPTIONAL SENTENCE

Jones makes two arguments attacking the trial court's imposition of an exceptional sentence on the basis of vulnerability of the victim. First, Jones argues that because he was convicted of an offense requiring a mens rea element of recklessness, there was no evidence that he possessed the requisite mental state to exploit the vulnerability of the victim. Second, Jones argues that because the age of the child constitutes part of the standard of care in determining whether he acted recklessly, the child's age and vulnerability may not be used to justify an exceptional sentence. In other words, since the acts that caused Kaylon's death would not have been reckless, but for the vulnerability of the child to injury, the court erred in considering vulnerability as an aggravating factor.

For a victim's vulnerability to justify an exceptional sentence, the defendant must know of the particular vulnerability and the vulnerability must be a substantial factor in the accomplishment of the crime. *See generally State v. Jackmon,* 55 Wn. App. 562, 566–67, 778 P.2d 1079 (1989). In arguing that there was no evidence that he possessed the requisite mental state to exploit the vulnerability of the victim, Jones relies on *State v. Crutchfield,* 53 Wn. App. 916, 771 P.2d 746 (1989), *limited by State v. Stevens,* 58 Wn. App. 478, 794 P.2d 38, *review denied,* 115 Wn.2d 1025 (1990).

In *Crutchfield,* as in this case, the defendant was convicted of first degree manslaughter. There, the defendant had lied to the victim to induce her to visit his apartment the night of her death. He had also misled the victim by telling her that a friend of his in the apartment was "full of hot air", when in fact he knew that the friend had violent propensities. 53 Wn. App. at 919. After conviction, the trial court imposed an exceptional sentence, in part based on a finding that by lying to the victim, the defendant abused a position of trust.

The appellate court held that while these events demonstrated that a relationship of trust existed between the defendant and the victim, the trial court erred in using "abuse of trust" as an aggravating factor to justify an exceptional sentence for the crime of first degree manslaughter. 53 Wn. App. at 923. In first degree manslaughter, the mental state of culpability is "recklessness". The *Crutchfield* court reasoned that a person who acts recklessly does not intend to commit an offense, and therefore, the defendant's reassurances to the victim were not made "to facilitate" the commission of the crime. 53 Wn. App. at 923.

The analysis Jones borrows from *Crutchfield,* which is based entirely on abuse of trust as an aggravating factor, simply has no application to determining whether vulnerability of the victim is an appropriate aggravating factor. In analyzing abuse of trust as an aggravating factor, the focus is on the defendant and whether he or she used a position of trust to facilitate the commission of the offense. RCW 9.94A.390(2)(c)(iv); *see Stevens,* 58 Wn. App. at 501 ("The proper inquiry is whether the defendant used his position to facilitate the commission of the crime, not whether the State has to prove a specific intent to commit the crime."). When analyzing whether vulnerability applies, the court focuses on the victim: whether or not the victim was more vulnerable to the offense than other victims due to extreme youth, advanced age, disability, or ill health and whether the defendant knew of that vulnerability. *See Jackmon,* 55 Wn. App. at 566–67; RCW 9.94A.390(2)(b). Accordingly, the mens rea element of the crime with which the defendant is charged has no relevance; instead, what is critical is whether the defendant knew or should have known of the victim's vulnerability, and whether the particular vulnerability was a substantial factor in accomplishment of the crime. *State v. Handley,* 115 Wn.2d 275, 284–85, 796 P.2d 1266 (1990); *Jackmon,* 55 Wn. App. at 566–67.

There is no question here but that 4–month–old Kaylon was vulnerable because of his extreme youth, and that

Jones, his father, knew of that vulnerability. There can be no doubt that the defenselessness of the child and his susceptibility to injury as an infant played a substantial part in the cause of his death.

Jones' second argument, that the age of the victim may not be a basis for an exceptional sentence when the age of the child is part of the standard of care in determining whether the defendant's actions were reckless, is also unpersuasive. At trial, Dr. Feldman testified that the severity on impact of the injury was comparable to an automobile accident or a fall from a window onto a cement floor. We have found no evidence in the record, nor has Jones pointed out any, supporting Jones' claim that his actions would not have been reckless but for the particular vulnerability of the victim.

Moreover, we are not convinced that simply because the mens rea of the crime is recklessness,[3] the victim's age is automatically a consideration in computation of the standard presumptive range. The well–established rule in Washington is that the trial court's reasons for imposing a sentence outside the standard range must take into account factors other than those which are necessarily considered in determining the presumptive range of the offense. *State v. Nordby,* 106 Wn.2d 514, 518, 723 P.2d 1117 (1986). A victim's vulnerability due to extreme youth is not a factor that was necessarily considered by the Legislature when setting the presumptive sentencing range for manslaughter in the first degree. *See State v. Fisher,* 108 Wn.2d 419, 424, 739 P.2d 683 (1987). Therefore, the extreme youth of the victim may properly be considered in imposing an exceptional sentence for the crime of manslaughter.

"An exceptional sentence is appropriate when the circumstances of a particular crime distinguish it from other

---

[3]RCW 9A.08.010 defines the term recklessness:

"A person is reckless or acts recklessly when he knows of and disregards a substantial risk that a wrongful act may occur and his disregard of such substantial risk is a gross deviation from conduct that a reasonable man would exercise in the same situation."

crimes within the same statutory definition." *Fisher,* 108 Wn.2d at 424. Unquestionably, in a category of people toward whom a manslaughter defendant could have acted recklessly, an infant unable to defend himself is more vulnerable than most manslaughter victims due to his extreme youth. *See Fisher,* 108 Wn.2d at 425 (exceptional sentence justified on the basis of victim's vulnerability where indecent liberties victim was 5 years old); *State v. Armstrong,* 106 Wn.2d 547, 550, 723 P.2d 1111 (1986) (exceptional sentence justified on the basis of victim's vulnerability where second degree assault victim was 10 months old).

In sum, the trial court's reason for imposing an exceptional sentence is supported by the record and not "clearly erroneous". *See State v. McAlpin,* 108 Wn.2d 458, 462, 740 P.2d 824 (1987). As the trial court has broad discretion in determining the length of an exceptional sentence, the sentence is affirmed. *See State v. Oxborrow,* 106 Wn.2d 525, 529–31, 723 P.2d 1123 (1986); *State v. Creekmore,* 55 Wn. App. 852, 873–74, 783 P.2d 1068 (1989) (Forrest, J., concurring), *review denied,* 114 Wn.2d 1020 (1990).

The conviction and sentence are affirmed.

GROSSE, A.C.J., and PEKELIS, J., concur.

Review denied at 116 Wn.2d 1021 (1991).