[No. 20493-9-I. Division One. November 6, 1989.]

THE STATE OF WASHINGTON, *Respondent*, v. DARREN
C. CREEKMORE, *Appellant*.

*Eric J. Nielsen* and *Julie A. Kesler* of *Washington Appellate Defender Association,* for appellant.

*Seth R. Dawson, Prosecuting Attorney,* and *Paul Stern, Ken Cowsert, Seth Aaron Fine,* and *Kevin M. Korsmo, Deputies,* for respondent.

[As amended by order of the Court of Appeals January 16, 1990.]

WEBSTER, J.—Darren Creekmore appeals his conviction of second degree felony murder, based on underlying felonies of second degree assault and second degree criminal mistreatment. Creekmore contends the felony murder rule should not apply to these felonies. He also argues that his 720–month sentence is "clearly excessive" under the Sentencing Reform Act of 1981 (SRA) and that it constitutes cruel and unusual punishment under the state and federal constitutions. We affirm.

## FACTS

Creekmore kicked his 3–year–old son Eli in the stomach on the evening of September 26, 1986. Eli's bowel ruptured, and he died several hours later. The fatal assault culminated a history of child abuse.

For example, on May 1, 1986, a day–care worker noticed extensive welts and bruises on the back of Eli's legs and buttocks.

> A: He had welts all over the back of his legs, both legs, a bruise behind his right knee. . . . [H]e had welts all over both buttocks and bruises. He had a bruise on his left forehead, on the inside of his right arm, and on his left elbow.
> . . . .

They were narrow and went across both buttocks and . . . both of the legs. They were red, and they had the white markings of breaking through the first layer of skin.

. . . .

Q: Eli complain of having any pain?
A: Yes.

Another worker noticed these injuries as well as bruises around Eli's penis and along his testicles.

A: He had welts on his legs, and in his groin area it was bruised above his penis and along the sides of his penis and down along the testicles.

. . . .

They were welts, . . . and it looked like almost like a pinch where it was red on each side and white in the center.

. . . .

It was all black and blue above his groin area, and on each side of his testicles there were big black and blue marks also, bruises.
Q: Were you concerned about those injuries?
A: Yes.

. . . . .

I called CPS.

The workers asked Creekmore about Eli's injuries. Creekmore initially denied, but later he admitted inflicting them.

Q: Did he tell you how he hit him, what he hit him with?
A: Yes. He said he got a yardstick . . .

. . . .

. . . [and] that he whipped him.
Q: Did he show any remorse?
A: No.
Q: Did he show any concern towards Eli?
A: No.

Creekmore said Eli "deserved" the injuries, because Eli "deliberately defied" him by messing his pants. Creekmore explained to a friend in grisly detail how the injuries occurred and why he used a yardstick.

A: He told me that Eli had peed his pants in the morning and he had made him take off his pants and stand with his legs spread so he could take a ruler up and down the inside of his legs.
Q: Did he tell you why he hit him with the ruler?
A: He said that he wasn't supposed to hit him with his hands anymore because he was leaving hand prints, that he could use anything he could pick up, or he could kick him.

Creekmore's wife, Mary, testified that whenever Eli messed his pants Creekmore would get angry. He would spank Eli and push him to the floor. He would then make Eli stand up and push him down again. He would also kick Eli in the buttocks. Mary was afraid to leave Creekmore because he had hit her in the past.

A week before Eli died, Creekmore made him eat a jalapeno pepper until Eli threw up. Creekmore hoped to "potty train" Eli in this way; he told Mary that when Eli pooped, it would burn him. Mary took Eli to a doctor who prescribed clear fluids and bland foods. Eli was ill for several days but he gradually got better. Mary suggested taking Eli to a doctor again, but Creekmore opposed the idea.

Mary explained the events of September 26, 1986, which led to Eli's death. Eli was eating dinner alone. Creekmore sat next to him, and Eli started to cry. Creekmore ordered Eli to go to his room, which Eli did, but he continued crying. Creekmore rushed into the bedroom. From the living room, Mary heard "a gasp and a thud." When Creekmore came out of the bedroom, Mary asked him what he had done. Creekmore said, "Nothing."

A few minutes later, Eli came out of his bedroom and told Mary he pooped his pants. Creekmore asked Eli, "Why did you poop your pants, boy?" Eli said, "Because you kicked me in the stomach." Creekmore yelled, "That's not true, and if you want me to make it true, I'll make it true." Creekmore then raised his foot as if to kick Eli. Creekmore was skilled in martial arts, and Mary knew this; she said, "No, don't kick him." Creekmore told her to go back into the living room, where she heard the rest.

Creekmore told Eli to wash his pants in the toilet. Eli said he peed his pants, and Creekmore said he was getting a belt. Mary tried to stop him, but he told her to stay out of it. She heard him whip Eli several times. "Eli was crying, and Darren was asking Eli if he wanted some more, and then he would hit him some more."

After a while, the noises stopped. Eli said he had to poop, so Creekmore told him to get on the toilet. Creekmore came

out of the bathroom saying Eli fell in the toilet. He said Eli would stay there until he could get himself out. Mary tried to help Eli, but Creekmore would not let her.

Eventually, a friend arrived. Mary then went to free Eli. She found him in the toilet with his butt in the water and his arms and legs hanging over the rim. He looked weak and limp. Eli had vomited on himself, so Mary took him out of the toilet and cleaned him up. He had "stripes" across his bottom and a 2– by 3–inch red mark on the left side of his abdomen. Creekmore came into the bathroom, and Eli started to vomit some more. Mary told him they should take Eli to a doctor. Creekmore said, "No, he's just throwing up because he's mad." Mary testified that Eli never threw up when he was mad.

Hoping to keep Creekmore away from Eli, Mary put Eli to bed and suggested that she, Creekmore, and their friend play a board game. While they were playing, Eli was moaning and vomiting. Mary checked on him several times and cleaned him up. At one point, Creekmore looked at her as if to say, "you better stay away from him." Creekmore then went into Eli's bedroom and told him to shut up and go to sleep.

Mary went to bed at about 10:45 p.m. She could hear Eli moaning, but she felt it was hopeless to try to get him to a doctor because Creekmore would not allow it.

Creekmore's friend testified that Eli came into the living room while Mary was sleeping. Eli looked "really white," and "he couldn't walk very well." Creekmore's friend said Eli should go to a hospital, but Creekmore said he would take care of it. Creekmore put Eli on his lap momentarily. Eli was shaking and sniffling. Creekmore then told Eli to go back to bed.

Creekmore checked on Eli at about midnight. A few minutes later, Creekmore came out of Eli's room and said Eli was dead. Creekmore's friend told him how to administer CPR. He called an ambulance, woke up Mary, and returned to help Creekmore. Paramedics arrived promptly,

but Eli was not breathing, and he had no pulse. They tried without success to revive Eli.

Mary rode in the ambulance to the hospital. Creekmore's friend ran there, as it was only 2½ blocks away. Creekmore arrived 15 minutes later. They were told that Eli was dead. They returned to the Creekmore house and went to bed. Mary was crying. Creekmore told her to shut up and to go to sleep.

An autopsy revealed a ruptured bowel caused by blunt trauma. The rupture caused an infection which led to septic shock and cardiac arrest. The force required to cause the rupture was more consistent with a kick than a punch.

One of Creekmore's friends testified that Creekmore had a powerful kick. Creekmore hurt this person in a sparring match and "whooped" three others "pretty good." Creekmore's friend recalled a time when Creekmore kicked him in the arm and drew blood. He said it takes "pretty good control" to break the skin without breaking the bone as well.

### FELONY MURDER

A person is guilty of second degree felony murder if he commits any felony (other than those supporting a conviction of first degree felony murder) and in the course and in furtherance thereof he causes the death of another. RCW 9A.32.050(1)(b). Criminal mistreatment and second degree assault are both felonies. RCW 9A.42.030(2); 9A.36.021(2). As such, they will support a charge of second degree felony murder.

■■ Creekmore contends that felony murder based on criminal mistreatment is the same as manslaughter. Felony murder is a class A felony with a seriousness level of 12; manslaughter is a class B felony with a seriousness level of 9. RCW 9A.32.050(2), .060; RCW 9.94A.310–.320. When the same conduct constitutes different crimes with different punishments, the result is a denial of equal protection. *State v. Zornes*, 78 Wn.2d 9, 475 P.2d 109 (1970); *Olsen v. Delmore*, 48 Wn.2d 545, 295 P.2d 324 (1956). However, no

constitutional defect exists when the crimes have different elements, or when one is a lesser included offense of the other. *State v. Wanrow*, 91 Wn.2d 301, 312, 588 P.2d 1320 (1978). That is the case here. Any recklessly caused death establishes first degree manslaughter, RCW 9A.32-.060(1)(a), whereas felony murder by criminal mistreatment depends on three additional elements: (1) the defendant must be a parent or custodian of the victim; (2) the victim must be a child or dependent; and (3) the death must be caused by withholding a basic necessity of life—in this case, health care. RCW 9A.42.030(1); .010(1). Because the elements of the two crimes are different, there is no denial of equal protection. *In re Taylor*, 105 Wn.2d 67, 68–69, 711 P.2d 345 (1985); *State v. Wanrow, supra.*

█ Our Supreme Court has repeatedly held that assault will support a charge of second degree felony murder. *See State v. Wanrow, supra; State v. Thompson*, 88 Wn.2d 13, 558 P.2d 202, *appeal dismissed*, 434 U.S. 898 (1977); *State v. Harris*, 69 Wn.2d 928, 421 P.2d 662 (1966). In his brief, Creekmore "respectfully submits that these holdings are erroneous and urges this Court to adopt the merger doctrine adopted by every other state in the country." However, this court may not reconsider decisions of our Supreme Court. *See Hamilton v. Department of Labor & Indus.*, 111 Wn.2d 569, 571, 761 P.2d 618 (1988); *State v. Gore*, 101 Wn.2d 481, 487, 681 P.2d 227, 39 A.L.R.4th 975 (1984).

## EXCEPTIONAL SENTENCE

The trial court sentenced Creekmore to 720 months, or 60 years. The standard range was 144 to 192 months, or 12 to 16 years. Creekmore's sentence is 5 times the lower end and 3.75 times the upper end of the standard range.

█ A trial court may impose a sentence outside the standard range if it finds, considering "the purpose" of the sentencing reform act, "that there are substantial and compelling reasons justifying an exceptional sentence." RCW 9.94A.120(2). "The purpose" of the act is punishment. *See*

*State v. Schaaf,* 109 Wn.2d 1, 10, 743 P.2d 240 (1987); RCW 9.94A.010(1)–(4). The reasons must "take into account factors other than those which are necessarily considered in computing the presumptive range for the offense." *State v. Nordby,* 106 Wn.2d 514, 518, 723 P.2d 1117 (1986).

■ Appellate review is defined by RCW 9.94A.210(4). *See* RCW 9.94A.390.

> To reverse a sentence which is outside the sentence range, the reviewing court must find: (a) Either that the reasons supplied by the sentencing judge are not supported by the record . . . or that those reasons do not justify a sentence outside the standard range . . .; or (b) that the sentence imposed was clearly excessive . . .

RCW 9.94A.210(4). The quoted section establishes a 3–part test: (1) Are the reasons supported by the record? (2) Do the reasons justify a departure from the standard range? and (3) Is the sentence "clearly excessive"? *State v. Dunaway,* 109 Wn.2d 207, 218, 743 P.2d 1237, 749 P.2d 160 (1987). The first question is answered affirmatively if the trial court's reasons are not "'clearly erroneous'"; the second, if the reasons are adequate as a "'matter of law'"; and the third, if the sentence is an "'abuse of discretion.'" *Dunaway,* at 218 (quoting *Nordby; State v. Oxborrow,* 106 Wn.2d 525, 532, 723 P.2d 1123 (1986)).

The Reasons Are Supported by the Record.

The trial court cited five reasons: (1) Eli's vulnerability, (2) multiple incidents of assault, (3) abuse of parental trust and responsibility, (4) no remorse, and (5) *no* mitigating factors. Creekmore concedes the first, third, and fifth reasons are supported by the record, but he says the second and fourth are not.

Regarding the second reason, multiple incidents, the trial court said:

> You committed multiple crimes against him and I'm referring, for the record, to the May incident when you beat him because you didn't like his bowel movement or lack thereof; on September 26, when you kicked him, when you beat him in the toilet, when you threw him in the toilet.

Even if reference to the "May incident" violated the "real facts" doctrine, RCW 9.94A.371,[1] the record establishes multiple incidents on September 26. Creekmore kicked Eli in the stomach, whipped him with a belt, and left him stuck in a toilet. These multiple incidents do not undermine jury unanimity, as Creekmore argues, because the kick is the only assault which could have caused Eli's death.

Regarding the fourth reason, lack of remorse, Creekmore contends the record does not permit effective appellate review, because the trial court did not identify "those aspects of [the] defendant's conduct to which [it was] referring." *State v. Payne,* 45 Wn. App. 528, 531, 726 P.2d 997 (1986) (citing *State v. Holland,* 98 Wn.2d 507, 517, 656 P.2d 1056 (1983)). *Payne* and *Holland* are distinguishable because, here, the record is replete with evidence that Creekmore had no sympathy for Eli before or after his death. Eli came out of his bedroom and said he had "pooped" his pants; Creekmore asked why, and Eli responded, "Because you kicked me in the stomach." Creekmore yelled, "That's not true, and if you want me to make it true, I'll make it true." He then approached Eli

---

[1]A statutory exception to the real facts doctrine is contained in RCW 9.94A.390(2)(e): "The offense was part of an ongoing pattern of sexual abuse of the same victim under the age of eighteen years manifested by multiple incidents over a prolonged period of time". *See* RCW 9.94A.370. Although the exception speaks only of "sexual abuse", other statutory exceptions have been expanded by judicial construction, because the list of aggravating factors in RCW 9.94A.390 "is illustrative rather than exclusive." *State v. Armstrong,* 106 Wn.2d 547, 550, 723 P.2d 1111 (1986) (exception for "multiple incidents per victim" in "major economic offense", RCW 9.94A.390(2)(c)(i), expanded to include multiple incidents of child abuse during the course of a second degree assault); *see State v. Dunaway,* 109 Wn.2d at 219 (applying "a similar analysis" to "multiple injuries during the course of attempting first degree murder"). While *Armstrong* and *Dunaway* are distinguishable in that the multiple incidents occurred during the course of a continuing offense, subsequent Court of Appeals cases have treated *Armstrong, Dunaway,* and *Nordby* as "judicially recognized exceptions to the real facts doctrine." *State v. Davis,* 53 Wn. App. 306, 312 n.4, 766 P.2d 1120 (1989); *see State v. Cook,* 52 Wn. App. 416, 420–21, 760 P.2d 964 (1988). Considering the spirit of the "sexual abuse" exception, and the just punishment and proportionality goals of the SRA, we see no reason why the "sexual abuse" exception should not be expanded to encompass multiple incidents of child abuse.

with his leg lifted as if to kick him. In the bathroom, Eli urinated on the floor, perhaps out of fear; Creekmore responded by getting a belt and whipping him. As Eli was crying, Creekmore said he would continue to whip Eli as long as he wanted to cry, which Eli did until the beating stopped. Eli said he had to poop again, and Creekmore came out of the bathroom saying Eli "fell" in the toilet. The trial court had every reason to believe that Eli was "thrown," and that he did not fall into the toilet, since Creekmore asserted minutes earlier that he did not even kick Eli. Creekmore prevented Eli's mother from coming to his aid, saying Eli would stay in the toilet until he could get himself out. All the while, Eli was vomiting on himself with his bare bottom in the water and his arms and legs hanging over the rim of the toilet. Eli's mother eventually freed him, but Creekmore refused to let her take him to a hospital. Medical testimony established that Eli must have been in pain, and in fact Eli moaned for hours in bed. Creekmore told Eli to shut up, forcing him to contain his moaning, but Eli continued; he also vomited for several hours until he died. Creekmore administered CPR, but the record supports the inference that he was motivated by self–interest rather than concern for Eli. Even after he knew Eli was dead, he refused to let even Eli's mother cry.

■ The trial court's reasons, far from being "clearly erroneous", are supported by the record.

The Reasons Justify an Exceptional Sentence.

The first and second reasons are well–established aggravating factors. *See* RCW 9.94A.390(2)(b) ("victim . . . particularly vulnerable . . . due to extreme youth"); *State v. Fisher,* 108 Wn.2d 419, 739 P.2d 683 (1987) (5½–year–old victim of indecent liberties); *State v. Armstrong,* 106 Wn.2d 547, 550, 723 P.2d 1111 (1986) ("defenseless 10–month–old child"; multiple injuries).

The third and fourth reasons are also well established. *See State v. Fisher,* at 426–27 (abuse of trust); *State v. Harp,* 43 Wn. App. 340, 342–43, 717 P.2d 282 (1986) (caretaker used position of trust to molest children); *State v.*

*Ratliff,* 46 Wn. App. 466, 470, 731 P.2d 1114 (1987) (no remorse).

■ Creekmore argues that the third reason, abuse of trust, was "necessarily considered in computing the presumptive range for the offense." *Nordby,* 106 Wn.2d at 518. Criminal mistreatment, he notes, presumes a breach of parental or custodial trust. However, second degree felony murder was sufficiently established by the assault which resulted in Eli's death. *State v. Crutchfield,* 53 Wn. App. 916, 922–23, 771 P.2d 746 (1989), which holds that one cannot use a relationship of trust to facilitate a crime of recklessness, is distinguishable, because Creekmore acted with knowledge. By convicting Creekmore of felony murder based on second degree assault, the jury specifically found that he *knowingly* inflicted grievous bodily harm. *See* RCW 9A.36.020(1)(b); instruction 13. Creekmore's commission of a subsequent act of felony murder by criminal mistreatment, by withholding medical treatment from his own child or a child in his physical custody, does not reduce the seriousness of a felony murder by second degree assault. Rather, the abuse of parental trust and responsibility increases his culpability.

■ The fifth reason, no mitigating factors, is *not* an aggravating factor, any more than the absence of aggravating factors creates a mitigating circumstance. *See Armstrong,* 106 Wn.2d at 551. However, the trial court had ample justification to exceed the standard range, and the lack of mitigation was relevant to the length of the sentence ultimately imposed. Thus, the trial court's reference to "*no* mitigating factors" should be considered in the final inquiry, whether the sentence is "clearly excessive." RCW 9.94A.210(4)(b).

The Sentence Is Not "Clearly Excessive".

■ An exceptional sentence is "clearly excessive" only if no reasonable person would impose it. *State v. Nelson,* 108 Wn.2d 491, 504–05, 740 P.2d 835 (1987); *State v. Pascal,* 108 Wn.2d 125, 138–39, 736 P.2d 1065 (1987); *State v. Armstrong,* 106 Wn.2d 547, 550, 723 P.2d 1111 (1986);

*Oxborrow,* at 531. "The practical effect of this standard is to guarantee that an appellate court will 'rarely, if ever' overturn an exceptional sentence because of its length." *State v. Clinton,* 48 Wn. App. 671, 678, 741 P.2d 52 (1987) (quoting *Armstrong,* at 553 (Goodloe, J., dissenting)); *State v. Handley,* 54 Wn. App. 377, 381, 773 P.2d 879 (1989).

Stated otherwise, the "clearly excessive" prong of appellate review under the sentencing reform act gives courts near plenary discretion *to affirm* the length of an exceptional sentence, just as the trial court has all but unbridled discretion in setting the length of the sentence. This necessarily follows from the lack of a legislative definition of "clearly excessive" and from the abuse–of–discretion standard of review. *See* RCW 9.94A.210(4)(b); *State v. Oxborrow,* 106 Wn.2d 525, 529–30, 723 P.2d 1123 (1986).

Appellate court discretion *to affirm* under the "clearly excessive" prong is a legislative creation, not a judicial one. *Oxborrow,* at 529–31; *Pascal,* at 138–39. The Legislature can always limit that discretion if it desires to do so. *Oxborrow,* at 532. Until that time, the Legislature has delegated the decision to us.

No case of this court or of our Supreme Court has ever reversed an exceptional sentence because of its length. We see no basis for making this the first.

We recently upheld a 648–month sentence for first degree murder. *State v. Harmon,* 50 Wn. App. 755, 750 P.2d 664, *review denied,* 110 Wn.2d 1033 (1988). A longer sentence has been imposed for felony murder based on deliberate cruelty. *See State v. Drummer,* 54 Wn. App. 751, 775 P.2d 981 (1989) (660 months). Neither case involved the scourge of child abuse. Eli was a defenseless, 3–year–old child killed mercilessly by his own father. The killing, although less bloody and arguably less brutal than the murders in *Harmon* and *Drummer,* was every bit as cruel. Eli's suffering was more prolonged and perhaps more severe, and his helplessness was horrifying.

In *State v. Oxborrow, supra,* our Supreme Court upheld *consecutive, maximum* term sentences for theft, one for 5

years, the other for 10 years. The 15–year total was 15 times the upper end of the SRA standard range. Creekmore's sentence is only 3.75 times the upper end of his standard range.

In *State v. Armstrong, supra,* "a totally defenseless 10–month–old child" was twice injured by scalding. 106 Wn.2d at 550. The defendant, in contrast to Creekmore, drove his victim to a hospital for treatment. *Armstrong,* at 548. He pleaded guilty to second degree assault and received a 5–year sentence—five times the SRA standard range. *Armstrong,* at 549. On review, the court affirmed the sentence, based on the helplessness of the victim and the multiple assaults, although two other reasons were invalid. *Armstrong,* at 550–51. The court deferred to the trial court, which believed the crime "was not a routine second degree assault but rather a flagrant act of child abuse requiring severe punishment." *Armstrong,* at 552. The court also noted that the sentence was only one–half the statutory maximum. *Armstrong,* at 552 n.1.

Here, Creekmore caused extended pain and suffering. He callously ignored that suffering, and the result was death. Eli was totally helpless; not even his mother could help him. He was at the mercy of a man, his own father, whom he could not please, and who rather than recognizing the limits of Eli's abilities, punished those shortcomings with a painful and merciless death. The trial court, having given the matter months of thought, said:

> Mr. Creekmore, to me, the murder of a child, especially a helpless, defenseless child, is by my way of thinking the most heinous crime that can be committed. . . . I don't know if we can prevent child abuse, but we have to try. I do know that we cannot tolerate child abuse. A society that does not prevent and/or tolerates child abuse is a society that is not civilized and is a society that is destined, as it should be, not to survive.

Given the mental and physical pain endured by Eli, our desire not to discount that suffering, and the trial court's firsthand knowledge of the facts, we find no abuse of discretion. The statutory maximum is life imprisonment. RCW 9A.32.050(2), 9A.20.021(1)(a). Creekmore's sentence

is less than the statutory maximum, and that is the only limit to the trial court's discretion in egregious cases. *See Oxborrow,* 106 Wn.2d at 533; *Armstrong,* 106 Wn.2d at 552 n.1.

Creekmore contends the trial court erred by considering the possibility of earned early release. *See* RCW 9.94A.150(1). This was improper, but the trial court in *Fisher* made the same error, and our Supreme Court nevertheless affirmed. *See State v. Fisher,* 108 Wn.2d at 429 n.6. In *State v. Dunaway, supra,* our Supreme Court remanded after invalidating two of three reasons for an exceptional sentence, because "the great disparity, some 20 years, between the sentence imposed and the midpoint of the standard range" was "too great . . . to assume that the trial judge would still impose the same sentence". 109 Wn.2d at 220. A like disparity, however, does not necessitate a remand "when we are satisfied that the judge would have imposed the same sentence absent the improper factor." *State v. Drummer, supra* at 760 (210–month disparity; record did not support finding that victim was particularly vulnerable).

We are satisfied the court would have imposed the same sentence even if it had not considered earned early release. The trial court considered Creekmore's killing "the most heinous crime that can be committed." The court also said:

> I do impose an exceptional sentence, and that sentence is 60 years. . . . It is a sentence that I believe to be just under the circumstances of this case.
> I started this sentence by saying, and I will conclude by saying, we must try to prevent child abuse. We cannot tolerate it. Under the facts of this case, I want to send a clear message to you and to others who may want to walk in your footsteps. It will not be tolerated in this court. . . . [A] sentence of 60 years I believe to be just under the circumstances . . .

We see no point in remanding when the trial court believes the sentence imposed is just and we are unwilling to find it "clearly excessive."

Creekmore contends his 60–year sentence is tantamount to life imprisonment without possibility of parole, because

even if he receives one–third off for good time, RCW 9.94A.150(1), he will still be nearly 70 years old before he is released. We are not persuaded: Creekmore's sentence is hardly the equivalent of a sentence for aggravated first degree murder. The minimum sentence for aggravated first degree murder is life imprisonment without possibility of parole; the maximum is death.

Creekmore notes that his sentence exceeds by about 15 years the top end of the standard range for a person convicted of first degree murder who has an offender score of 9 or more. *See* RCW 9.94A.310. An offender score of 9 is the equivalent of 3 prior murders. *See* RCW 9.94A.360(9). However, a first degree murderer with three prior murders would have already served 80 years if he had received the presumptive sentence for those murders. *See* RCW 9.94A-.310, .360(9).

Creekmore refers to a letter from the Sentencing Guidelines Commission which reveals that 11 exceptional sentences were imposed for second degree murder from 1985 through 1987. Creekmore's sentence was the highest of the 11 at 720 months. The lowest was 216 months, and the average, 361 months. In 7 of the 11 cases, the victims were vulnerable. During the same 3–year period, a total of 13 sentences for crimes other than aggravated first degree murder exceeded the upper end of the highest standard range, or 548 months. RCW 9.94A.310. The highest of the 13 sentences was 900 months; the lowest, 600 months; the average, 691 months. Eight of these thirteen cases involved vulnerable victims, including the 900–month sentence.

Creekmore attempts to distinguish the 900–month sentence by implying that it involved multiple counts served consecutively. However, the letter from the Sentencing Guidelines Commission says it was given for *concurrent* convictions of first degree rape and first degree kidnapping. The 900–month sentence contradicts Creekmore's claim that his sentence is more severe than any punishment meted out in this state for any crime other than aggravated first degree murder.

 Moreover, statistics are dubious because there is no way of knowing whether the cases and crimes they represent are as serious as Creekmore's. The same can be said of four unpublished SRA cases cited in Creekmore's brief. Three of the cases allegedly involve second degree felony murder and child abuse, but nothing else is known of the facts. Nor is it established that the relatively small sampling is representative of other unpublished SRA cases involving second degree felony murder and child abuse. For this reason, and others, it is plainly improper to rely on unpublished decisions of this court. RAP 10.4(h); *State v. Fitzpatrick*, 5 Wn. App. 661, 668, 491 P.2d 262 (1971). Finally, to find an abuse of discretion, we must conclude that *no* reasonable judge would impose a 60–year sentence, not that other judges have imposed lesser sentences for similar crimes.

Creekmore contends the Legislature expressed an intent that his crime be punished within the standard range of homicide by abuse.

> A person is guilty of homicide by abuse if, under circumstances manifesting an extreme indifference to human life, the person causes the death of a child or person under sixteen years of age, a developmentally disabled person, or a dependent adult, and the person has previously engaged in a pattern or practice of assault or torture of said child, person under sixteen years of age, developmentally disabled person, or dependent person.

RCW 9A.32.055. The Legislature created this offense in response to a public outcry following Creekmore's crime. Senate Journal, 50th Legislature (1987), at 156–58. The standard range for homicide by abuse would be 261 to 347 months, or approximately 22 to 29 years, based on Creekmore's prior conviction of aggravated assault.

Still, Eli's age would warrant an exceptional sentence under the new statute. *See State v. Fisher*, 108 Wn.2d at 423–24 (5½–year–old victim; indecent liberties). Creekmore's criminal mistreatment, or abuse of trust, and his lack of remorse for Eli would also be aggravating factors

warranting a departure from the standard range for homicide by abuse. Finally, we doubt the Legislature intended to limit Creekmore's sentence by enacting the crime of homicide by abuse, because rather than limiting criminal responsibility for child abuse, the Legislature expanded it. Senator Talmadge, a chief spokesman for the bill, spoke as follows just before he and his fellow Senators passed it unanimously:

> To deal with the problem of child abuse effectively, we have to deal with the criminal law, as we have done in this bill and provide for criminal sanctions to those people who would so far exceed the boundaries of civilized behavior as to do this kind of harm to children. . . .
> . . . [A]nyone who engages in this kind of practice of abuse is going to be subject to these kinds of penalties and as Senator Halsan said, '*We made this as serious a crime as we can make it.*'

(Italics ours.) Senate Journal, 50th Legislature (1987), at 157. Senator Deccio added, "We may never solve the problem of child abuse, but we can certainly, . . . through penalties like this, at least make a dent in probably one of the greatest social problems that we've got in the United States today." Senate Journal, at 158. The Legislature clearly intended maximum penalties for child abusers; it would twist their intent by interpreting their actions in favor of Creekmore.

We note that the Legislature did not increase the maximum punishment for child abusers by enacting the crime of homicide by abuse, RCW 9A.32.055. Homicide by abuse is in the same class as first degree murder, but the statutory maximum is no greater than for second degree felony murder. *See* RCW 9A.32.050(2), .055(3), 9A.20.021(1)(a). The new law simply moves Creekmore's crime from an SRA seriousness level of 12 to a seriousness level of 13. *See* RCW 9.94A.320. The result is a doubling of the presumptive sentence, from 12 to 24 years, when the defendant's offender score is 1; however, when the offender score is 9 or more, the increase is only one–third, from 29 to 40 years. *See*

RCW 9.94A.310. A defendant could commit several acts of homicide by abuse without ever receiving a life sentence.

The new law would be noticeable in a case like this if Creekmore's crime were moved to a seriousness level of 14. *See* RCW 9.94A.320. Then it would be in the same class as aggravated first degree murder. Only then would it be "as serious a crime as we can make it." Senate Journal, *supra*. The mandatory minimum sentence would be life imprisonment, and a jury could impose death. RCW 9.94A.310. When a person causes the death of a child as part of a pattern or practice of assault or torture, we believe the crime is as serious as aggravated first degree murder.

CRUEL AND UNUSUAL PUNISHMENT

Creekmore's last challenge to his sentence is based on the constitutional ban of cruel and unusual punishment. U.S. Const. amend. 8; Const. art. 1, § 14; *see State v. Smith,* 93 Wn.2d 329, 339 n.5, 610 P.2d 869 (provisions given "essentially identical treatment"), *cert. denied,* 449 U.S. 873 (1980).

Only punishment which is "grossly disproportionate to the gravity of the offense" violates the state and federal constitutional guaranty. *State v. Bowen,* 51 Wn. App. 42, 47, 751 P.2d 1226 (1988). To be "grossly disproportionate" punishment must be "clearly arbitrary and shocking to the sense of justice." *State v. Smith,* 93 Wn.2d at 344-45. For example, in *Solem v. Helm,* 463 U.S. 277, 77 L. Ed. 2d 637, 103 S. Ct. 3001 (1983), the Supreme Court reversed a sentence of life imprisonment without possibility of parole for a nonviolent habitual offender convicted of passing a bad check for $100. Referring to *Enmund v. Florida,* 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct. 3368 (1982), in which the Court held that an *accomplice* to felony murder could not be sentenced to *death* without a showing that he killed or intended to kill, the Court in *Solem* said, "clearly no sentence of imprisonment would be disproportionate for Enmund's crime." 463 U.S. at 290 n.15. By this assessment, any sentence short of death would be constitutionally

acceptable in Creekmore's case. Even death would presumably be acceptable, because *Enmund* is distinguishable. Enmund was a passenger in a getaway car and had nothing to do with the killing. The killing occurred during the course of a robbery perpetrated by others. Here, Creekmore caused Eli's death: he not only knowingly inflicted grievous bodily harm, but he also ignored obvious signs of suffering, as well as statements by others that Eli needed immediate treatment. Considering the gravity of Creekmore's offense, it would be perverse to declare his sentence "shocking to the sense of justice."

Proportionality analysis under the Eighth Amendment would yield the same result. Before a sentence can be declared cruel and unusual, it must be "significantly disproportionate" in view of three objective criteria:

> (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions.

*Solem v. Helm*, 463 U.S. at 292. The first step focuses on the harm caused and the culpability of the offender. *Solem,* at 292–93. Here, the harm caused was the death of Eli, whose helplessness and suffering, coupled with Creekmore's knowing infliction of grievous bodily harm and indifference to it, establish a high degree of culpability. The second prong of the analysis depends on *maximum* penalties for the same conduct in the same jurisdiction. *Solem,* at 298; *State v. Bowen,* 51 Wn. App. at 48. In Washington, if Creekmore had raped Eli, rather than killed him, he could have received life imprisonment. Former RCW 9A.44.070, now 9A.44.073. Creekmore could have been sentenced to life imprisonment for first degree assault, kidnapping, arson, burglary, or robbery, as well. Former RCW 9A.36-.010(2), .40.020(2), .48.020(2), .52.020(2), .56.200(2). The third prong also looks to maximum penalties, but in other jurisdictions for the same conduct. *Solem,* at 299. In 5 states, Creekmore could have been sentenced to death; in another 29, to life imprisonment without possibility of

parole; in 4 more, to at least 60 years. In sum, 38 states would permit a greater sentence than Creekmore received, and only 11 would require a lesser.

Creekmore erroneously relies on a sampling of cases from other jurisdictions in which shorter sentences were imposed. The sampling is irrelevant because it disregards the permissible sentence in those jurisdictions, and because it is not necessarily representative. He does not contend the sampling is randomly selected or that it is statistically significant.

Creekmore argues that eligibility for parole is critical to an Eighth Amendment analysis. However the most that can be said is that parole "may complicate the comparison, depending upon the time and conditions of its availability." *Solem v. Helm,* 463 U.S. at 294 n.19. In *Solem v. Helm,* unavailability of parole *for life* was significant because "Helm's crime was 'one of the most passive felonies a person could commit.'" *Solem,* at 296 (quoting *State v. Helm,* 287 N.W.2d 497, 501 (S.D. 1980) (Henderson, J., dissenting)). Here, in contrast, Creekmore's crime was violent and heinous. "[C]learly no sentence of imprisonment would be [unconstitutionally] disproportionate" for felony murder. *Solem v. Helm,* 463 U.S. at 290 n.15 (referring to *Enmund v. Florida, supra*).

CONCLUSION

Creekmore was properly convicted; *any* felony will support a charge for second degree felony murder. The trial court had substantial and compelling reasons to impose a 60–year sentence. The sentence is not clearly excessive, and it is certainly not cruel and unusual punishment.

We affirm.

GROSSE, A.C.J., concurs.

[No. 20493-9-I. November 29, 1989.]

FORREST, J. (concurring)—I concur in the result. This is an aggravated crime. The facts of the case as set out in the majority opinion abundantly justify an exceptional sentence and indeed a severe exceptional sentence. Nonetheless, in my opinion, the sentence imposed is "clearly excessive". This opinion is based on the overall Washington sentencing grid for crimes, the standard range for the new crime of homicide by abuse created in response to the facts of this case,[2] the facts in other child abuse cases, and the proportionality between the facts and the penalty. However, I am unable to say that no reasonable judge would impose such a sentence.[3] Accordingly, under present law I am bound to concur in the result.[4]

Because of the importance of the standard of review of exceptional sentences, I briefly state my objections to the current standard that reviews the duration of an exceptional sentence only for an abuse of discretion. By definition, an abuse of discretion standard permits a wide range of sentencing. That width is illustrated by this case. The maximum sentence within the standard range would be 192 months. A sentence within the standard range would be nonreviewable. The actual sentence imposed, and now rendered nonreviewable in the majority opinion, is 720 months. The vast range of discretion is candidly acknowledged by the majority, at 864:

> Stated otherwise, the "clearly excessive" prong of appellate review under the sentencing reform act gives courts near plenary discretion *to affirm* the length of an exceptional sentence,

---

[2]RCW 9A.32.055.

[3]*State v. Nelson*, 108 Wn.2d 491, 740 P.2d 835 (1987).

[4]*State v. Altum*, 47 Wn. App. 495, 735 P.2d 1356, *review denied*, 108 Wn.2d 1024 (1987); *State v. Oxborrow*, 106 Wn.2d 525, 723 P.2d 1123 (1986).

just as the trial court has all but unbridled discretion in setting the length of the sentence.

As Justice Goodloe prophetically observed, the practical effect of an abuse of discretion standard is to guarantee that an appellate court will rarely, if ever, overturn an exceptional sentence because of its length.[5] The majority places the responsibility for this essentially uncontrolled discretion upon the Legislature. "This necessarily follows from the lack of a legislative definition of 'clearly excessive' and from the abuse–of–discretion standard of review." Majority, at 864.

I find the term "clearly excessive" a fair and reasonable standard. No formula will dictate the results. It is a normal and essential function of appellate courts to give specific content to broad general terms such as "due process of law." The United States Supreme Court deals comfortably with the broad general standard of "cruel and unusual punishment".[6] So too have the Washington courts. In *State v. Fain*,[7] the Supreme Court held that a sentence of life imprisonment was cruel and unusual when imposed upon a person found to be a habitual criminal based on three convictions for minor offenses not involving offenses to persons or property. In *State v. Ross*,[8] this court upheld a life sentence imposed on a person found to be a habitual offender based on seven convictions for offenses involving severe penalties.

This is analogous to the type of review that would be involved in deciding that in a given case, a sentence of 700 months is "clearly excessive" while a sentence of 600 months is not. In my view, it is *the courts'* responsibility to

---

[5]*State v. Armstrong*, 106 Wn.2d 547, 553, 723 P.2d 1111 (1986) (Goodloe, J., dissenting).

[6]*Stanford v. Kentucky*, ___ U.S. ___, 106 L. Ed. 2d 306, 109 S. Ct. 2969 (1989); *Penry v. Lynaugh*, ___ U.S. ___, 106 L. Ed. 2d 256, 109 S. Ct. 2934 (1989).

[7]94 Wn.2d 387, 617 P.2d 720 (1980).

[8]30 Wn. App. 324, 634 P.2d 887 (1981), *review denied*, 96 Wn.2d 1027 (1982).

implement "clearly excessive" in light of the purposes of the SRA. Furthermore, it is the courts that chose the abuse of discretion standard, not the Legislature. A frequently stated test for abuse of discretion is a decision "no reasonable judge would have made"; *State v. Nelson*[9] specifically applies this test to sentencing. The other classic formulation of the abuse of discretion standard is a decision that is "manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." *State ex rel. Carroll v. Junker.*[10] In the sentencing context, before reaching the issue of duration, tenable grounds and tenable reasons for the exceptional sentence have already been found. Therefore, the two formulas yield identical results: Is the sentence one that no reasonable judge would impose?

It is unfortunate that this formula has been adopted, as it focuses on the judge's mental state instead of the reasons for his decision. An experienced and reasonable trial judge does not suddenly become "unreasonable" on a particular day. He may make an erroneous or unreasonable decision, just as a normally prudent driver can be negligent and cause an accident. The true question is always: Do the facts and reasons given justify the result in question?

To emphasize the fallacy of this test for abuse of discretion, let me pose an unlikely hypothetical. A motion for reconsideration is made on the basis that the judge abused his discretion. In opposition to the motion, the affidavits of two recently retired superior court judges are filed, each one stating he has reviewed the facts and circumstances and he would make the same decision. The judge adheres to his decision and the matter is appealed. The Court of Appeals would be hard pressed to say that no reasonable judge would make such a decision in the face of the affidavits. But its responsibility for review does not evaporate. It retains the responsibility and authority to determine

[9] 108 Wn.2d 491, 496, 740 P.2d 835 (1987).

[10] 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

whether or not the facts and circumstances justify the decision.

Appendix 1 lists a number of reasons approved by appellate courts as justifying an exceptional sentence. Appendix 2 lists all reasons used by trial courts to justify an exceptional sentence, whether approved or not. The list of reasons, already long, continues to grow. By itself, this list of reasons is not out of harmony with the SRA. However, in conjunction with the absence of any appellate control over the duration of sentences, it becomes so. The majority finds no case reversing a sentence as clearly excessive because of duration. Majority, at 864. It accepts this with equanimity. To me it suggests that the appellate courts have effectively read "clearly excessive" out of the SRA.

Discretion in criminal sentences is a function of the number of reasons approved as justifying an exceptional sentence as one variable, and the approved durations of exceptional sentences as the other variable. With no control of duration, the total amount of discretion increases as new reasons are approved. The present standard for review of duration and the presently approved reasons together generate excessive individual discretion. The purpose of the SRA was to provide structure to the trial court's exercise of discretion, to promote uniformity in sentencing and, ultimately, to build a common law of sentencing.[11] By requiring that punishment be "commensurate with the punishment imposed on others committing similar offenses",[12] the SRA promotes the concept of proportionality. It encourages respect for law by requiring "punishment which is just".[13] Under the current policy, once the threshold of an acceptable reason justifying an exceptional sentence is passed, the trial court is permitted "unbridled

---

[11]RCW 9.94A.010 et seq.

[12]RCW 9.94A.010(3).

[13]RCW 9.94A.010(2). See also D. Boerner, Sentencing in Washington § 2.5(a), at 2–31 (1985).

discretion" as to the duration of the sentence. This is not the purpose of the SRA.

In an ideal judicial world, the same defendant would receive the same sentence regardless of which of the 156 superior court judges presided. While that ideal cannot be achieved, the SRA is an effort to approach such ideal by structuring discretion, and should be interpreted to that effect. The abuse of discretion standard as applied to duration of exceptional sentences does nothing to realize this goal. Rather, it ensures that in the area of exceptional sentences, the judge before whom the defendant appears will make an enormous difference.

In my view, it is the responsibility of the appellate court to decide whether a sentence is "clearly excessive" by exercising its own judgment as to the relationship between the reasons given and the duration imposed; not by reference to what some hypothetical reasonable judge would not do. If a sentence of 20 years is imposed and the reviewing court finds the sentence to be "clearly excessive", it should say that 20 years is clearly excessive and that 15 years is appropriate in light of the reasons found by the trial court. This may seem strange, but once the duration of a sentence is regarded as a legal conclusion to be drawn from the reasons given, it will be recognized to be consistent with the appellate process.[14]

I find it hard to understand how a court could ever recognize a sentence as being clearly excessive if it does not have a standard of what is an appropriate sentence. Such a standard, if unexpressed, should be made explicit. An appellate court's announcement that a sentence of 20 years is not in its judgment "clearly excessive" furnishes much greater guidance to trial courts than simply holding that 20 years is not an abuse of discretion. Indeed, approving a sentence of 20 years using an abuse of discretion standard

---

[14]*State v. Fain,* 94 Wn.2d 387, 617 P.2d 720 (1980); *State v. Ross,* 30 Wn. App. 324, 634 P.2d 887 (1981), *review denied,* 96 Wn.2d 1027 (1982).

does not even establish if it is the maximum that could be imposed. It therefore provides no effective guidance.

Another problem exists. If an appellate court does find the duration of a sentence to be an abuse of discretion, how should the matter be handled? Is the case remanded with no specific direction as to the appropriate sentence? What is the trial judge to do? Except in the unlikely case where the appellate opinion has presented a genuinely new consideration, the trial court presumably remains of the same opinion. Surely the judge exercised his best judgment at the time he determined the original sentence. He now must guess how much to reduce the sentence in order to have it approved on a new appeal. No "correct" sentence exists. The trial judge must ask: Is a reduction of 10 percent what the appellate court had in mind? Or perhaps 20 percent? This indirect approach to establishing the appropriate sentence is not a satisfactory method of implementing the SRA.

A determination by three appellate judges as to the appropriate duration of an exceptional sentence represents the common agreement of three minds. Such sentences will presumably cluster around a narrower range than those of individual trial judges. Appellate judges are somewhat removed from the immediate impact of the trial and the community in which it took place. Such detachment should help ensure fairness and proportionality. In due course, there will be examples of analogous facts and durations to help structure the results. There will never be one demonstrably correct sentence. It will never be possible to say that 20 years is right and 21 years is wrong. The fact that it is a question of range rather than an exact number does not alter the appellate court's responsibility to independently determine a result appropriate to the reasons given by the trial judge.

Norms and patterns will develop. A trial judge will be able to compare the unique facts of his case with the facts

of other cases, and then relate his sentence to other sentences which have been specifically approved at the appellate level. An abuse of discretion standard will never produce a common law of sentencing as to the duration of exceptional sentences. Appellate court determinations will. Having appellate court judges express their own judgment as to the appropriate duration by either affirming the exceptional sentence or reducing it to what they deem an appropriate length is new. But sentencing under the SRA is sui generis. In my judgment, the only way to structure sentencing in regard to the length of an exceptional sentence, and thus properly implement the SRA, is for the appellate court to accept this responsibility.

APPENDIX 1

REASONS FOR AN EXCEPTIONAL SENTENCE APPROVED
ON APPEAL

*Reasons specifically listed as illustrative in RCW 9.94A.390

1. *State v. Altum,* 47 Wn. App. 495, 735 P.2d 1356, *review denied,* 108 Wn.2d 1024 (1987)
 First Degree Rape, Second Degree Robbery
 Standard Sentence Range: 98–130 months
 Imposed Sentence: 480 months
 Reasons Given: A. Excessive violence, brutality
 B. Victim particularly vulnerable*
 C. Repeated acts of forcible intercourse

2. *State v. Armstrong,* 106 Wn.2d 547, 723 P.2d 1111 (1986)
 Second Degree Assault
 Standard Sentence Range: 12–14 months
 Imposed Sentence: 60 months
 Reasons Given: A. Victim particularly vulnerable*
 B. Multiple injuries

3. *State v. Bernhard,* 108 Wn.2d 527, 741 P.2d 1 (1987)
 Second Degree Burglary
 Standard Sentence Range: 4–12 months
 Imposed Sentence: 4 months prison, 12 months drug
 rehabilitation

Reasons Given: A. Crimes resulted from addiction
B. Prior jail time did not affect behavior
C. Further incarceration would not affect behavior

4. *State v. Butler,* 53 Wn. App. 214, 766 P.2d 505, *review denied,* 112 Wn.2d 1014 (1989)
Second Degree Assault
Standard Sentence Range: 13–17 months
Imposed Sentence: 48 months
Reasons Given: A. Victim particularly vulnerable*
B. Multiple incidents upon the same victim
C. Injuries inflicted were very severe
D. Injuries could have been avoided

5. *State v. Clinton,* 48 Wn. App. 671, 741 P.2d 52 (1987)
First Degree Rape, First Degree Burglary
Standard Sentence Range: 67–89 months for first rape;
51–68 months for second and third rape
Imposed Sentence: 108 months for each rape consecutive, burglary sentenced concurrently
Reasons Given: A. Victim particularly vulnerable*
B. Deliberate cruelty*
C. Excessive brutality

6. *State v. Davis,* 47 Wn. App. 91, 734 P.2d 500, *review denied,* 108 Wn.2d 1029 (1987)
First Degree Assault, First Degree Robbery
Defendant was sentenced "outside the presumptive range"
Reasons Given: A. Deliberate cruelty*
B. Victim particularly vulnerable*
C. Defendant used a position of trust to facilitate the crime

7. *State v. Davis,* 53 Wn. App. 306, 766 P.2d 1120, *review denied,* 112 Wn.2d 1015 (1989)
Vehicular Homicide
Standard Sentence Range: 21–27 months
Imposed Sentence: 48 months
Reasons Given: A. Three other persons were injured
B. Defendant demonstrated disregard for the danger his chemical abuse causes
C. Failed rehabilitation
D. Danger to the public

8. *State v. Dennis,* 45 Wn. App. 893, 728 P.2d 1075 (1986), *review denied,* 108 Wn.2d 1008 (1987)
 First Degree Kidnapping, First Degree Rape
 Standard Sentence Range: 67–89 months
 Imposed Sentence: 180 months
 Reasons Given: A. Deliberate cruelty*
 B. Purposeful, thought–out course of conduct

9. *State v. Dunaway,* 109 Wn.2d 207, 743 P.2d 1237, 749 P.2d 160 (1987)
 Attempted Murder
 Standard Sentence Range: 203.25–270.25 months
 Imposed Sentence: 480 months
 Reasons Given: A. Planning, sophistication of the crime
 B. Deliberate cruelty*
 C. Sentencing range does not provide adequate protection for society*

10. *State v. Edwards,* 53 Wn. App. 907, 771 P.2d 755, *review denied,* 113 Wn.2d 1002 (1989)
 First Degree Rape (3 counts)
 Standard Sentence Range: 72–96 months
 Imposed Sentence: 156 months
 Reasons Given: A. Nonamenability to treatment
 B. Multiple incidents of abuse
 C. Victims particularly vulnerable*

11. *State v. Falling,* 50 Wn. App. 47, 747 P.2d 1119 (1987)
 First Degree Rape
 Standard Sentence Range: 62–82 months
 Imposed Sentence: 120 months
 Reasons Given: A. Rape occurred at victim's residence
 B. Defendant used a knife during a
 C. Prolonged ordeal of sexual abuse
 D. Continuing series of threats
 E. Deliberate cruelty*
 F. No remorse

12. *State v. Fisher,* 108 Wn.2d 419, 739 P.2d 683 (1987)
 Indecent Liberties (2 counts)
 Standard Sentence Range: 15–20 months (per count)
 Imposed Sentence: 24 months (per count)
 Reasons Given: A. Victim particularly vulnerable*
 B. Multiple incidents
 C. Position of trust

13. *State v. Garnier*, 52 Wn. App. 657, 763 P.2d 209 (1988), *review denied*, 112 Wn.2d 1004 (1989)
 Second Degree Burglary, Attempted Second Degree Burglary
 Standard Sentence Range: 43–57 months
 Imposed Sentence: 108 months
 Reasons Given: A. Multiple victims
 B. High degree of sophistication
 C. Unusually high offender's score

14. *In re George*, 52 Wn. App. 135, 758 P.2d 13 (1988)
 Indecent Liberties, Second Degree Statutory Rape, Incest
 Standard Sentence Range: 68–88 months
 Imposed Sentence: 211 months
 Reasons Given: A. Multiple incidents with each victim
 B. Crimes were predatory and violent
 C. Defendant not amenable to treatment

15. *State v. Gunther*, 45 Wn. App. 755, 727 P.2d 258 (1986), *review denied*, 108 Wn.2d 1013 (1987)
 Delivering Cocaine
 Standard Sentence Range: 12–14 months
 Imposed Sentence: 24 months
 Reasons Given: A. Quantity larger than for personal use*
 B. Defendant possessed a firearm

16. *State v. Handley*, 54 Wn. App. 377, 773 P.2d 879 (1989)
 Second Degree Possession of Stolen Property, First Degree
 Rendering Criminal Assistance, First Degree Conspiracy
 To Commit Robbery
 Standard Sentence Range: 2–5 months, 13–17 months,
 30.75–40.50 months
 Imposed Sentence: 81 months
 Reasons Given: A. Victim particularly vulnerable*
 B. Defendant used a position of trust
 to facilitate the crime
 C. Defendant knew there was a high probability
 of injury to the victim

17. *State v. Harmon*, 50 Wn. App. 755, 750 P.2d 664, *review denied*, 110 Wn.2d 1033 (1988)
 First Degree Murder
 Standard Sentence Range: 250–333 months
 Imposed Sentence: 648 months
 Reasons Given: A. Deliberate cruelty*
 B. Multiple injuries

18. *State v. Hernandez*, 48 Wn. App. 751, 740 P.2d 374, *review denied*, 109 Wn.2d 1020 (1987)
 First Degree Rape, First Degree Robbery
 Standard Sentence Range: 86–106 months
 Imposed Sentence: 159 months
 Reasons Given: A. Deliberate cruelty*
 B. Defendant invaded zone of privacy

19. *State v. Hernandez*, 54 Wn. App. 323, 773 P.2d 857 (1989)
 First Degree Murder, First Degree Assault
 Standard Sentence Range: Concurrent
 Imposed Sentence: Consecutive (474 months)
 Reasons Given: A. Deliberate and premeditated
 B. Victims particularly vulnerable*
 C. Presumptive sentence clearly too lenient*

20. *State v. Holyoak*, 49 Wn. App. 691, 745 P.2d 515 (1987), *review denied*, 110 Wn.2d 1007 (1988)
 First Degree Assault
 Standard Sentence Range: 93–123 months
 Imposed Sentence: 246 months
 Reasons Given: A. Victim particularly vulnerable*
 B. Exceptional cruelty*
 C. Future dangerousness

21. *State v. McAlpin*, 108 Wn.2d 458, 740 P.2d 824 (1987)
 First Degree Robbery
 Standard Sentence Range: 46–61 months
 Imposed Sentence: 90 months
 Reasons Given: A. Criminal history
 B. Danger to the community
 C. Sophisticated criminal

22. *State v. Mejia*, 111 Wn.2d 892, 766 P.2d 454 (1989)
 Possession of Cocaine With Intent To Deliver
 Standard Sentence Range: 12–14 months
 Imposed Sentence: 30 months
 Reasons Given: A. The largest seizure of cocaine
 in Yakima County history*

23. *State v. Nordby*, 106 Wn.2d 514, 723 P.2d 1117 (1986)
 Vehicular Assault
 Standard Sentence Range: 6–12 months
 Imposed Sentence: 16 months
 Reasons Given: A. Victim particularly vulnerable*
 B. Intention to commit crime
 C. Seriousness of victim's injuries

24. *State v. Olive,* 47 Wn. App. 147, 734 P.2d 36, *review denied,* 109 Wn.2d 1017 (1987)
 Unlawful Imprisonment
 Standard Sentence Range: 3–8 months
 Imposed Sentence: 14 months
 Reasons Given: A. Victim particularly vulnerable*
 B. Prior sexual offenses
 C. Need for confined treatment
 D. Threat to others

25. *State v. Oxborrow,* 106 Wn.2d 525, 723 P.2d 1123 (1986)
 First Degree Theft, Violation of a Cease and Desist Order
 Standard Sentence Range: 0–3 months, 0–12 months
 Imposed Sentence: 180 months
 Reasons Given: A. Major economic offense and
 B. Involved multiple victims*
 C. Monetary loss was greater than typical*
 D. High degree of sophistication*
 E. Defendant used a position of trust to facilitate the crime*

26. *State v. Payne,* 45 Wn. App. 528, 726 P.2d 997 (1986)
 Second Degree Assault
 Standard Sentence Range: 3–9 months
 Imposed Sentence: 60 months
 Reasons Given: A. Defendant forced victim to perform sexual acts
 B. Victim particularly vulnerable*
 C. Deliberate cruelty*
 D. Risk to reoffend

27. *State v. Ratliff,* 46 Wn. App. 325, 730 P.2d 716 (1986), *review denied,* 108 Wn.2d 1002 (1987)
 Second Degree Malicious Mischief
 Standard Sentence Range: 0–3 months
 Imposed Sentence: 6 months
 Reasons Given: A. Deliberate maliciousness toward police
 B. Pattern of similar convictions
 C. Standard range not commensurate with the seriousness of the crime*

28. *State v. Ratliff,* 46 Wn. App. 466, 731 P.2d 1114 (1987)
 Intimidating a Witness
 Standard Sentence Range: 15–20 months
 Imposed Sentence: 40 months

Reasons Given: A. Deliberate cruelty*
 B. Invasion of the zone of privacy
 C. Intention to cause mental anguish

29. *In re Rolston,* 46 Wn. App. 622, 732 P.2d 166 (1987)
Indecent Liberties
Standard Sentence Range: 12–14 months
Imposed Sentence: 20 months
Reasons Given: A. Victim particularly vulnerable*
 B. Flagrant probation violations
 C. Failure at rehabilitation
 D. Lack of appreciation for damage caused
 E. Danger to the community

30. *State v. Shephard,* 53 Wn. App. 194, 766 P.2d 467 (1988)
Indecent Liberties
Standard Sentence Range: 12–14 months
Imposed Sentence: 63 months (includes probation violation)
Reasons Given: A. Victim particularly vulnerable*
 B. Sexual deviancy has not been cured
 by prior treatment
 C. Danger to the community

31. *State v. Smith,* 49 Wn. App. 596, 744 P.2d 1096 (1987), *review denied,* 110 Wn.2d 1007 (1988)
Second Degree Possession of Stolen Property
Standard Sentence Range: 0–2 months
Imposed Sentence: 3 months
Reasons Given: A. First–time offender provision

32. *State v. Stalker,* 42 Wn. App. 1, 707 P.2d 1371 (1985), *review denied,* 107 Wn.2d 1018 (1986)
Attempting To Sell Marijuana
Standard Sentence Range: 1–3 months
Imposed Sentence: 12 months
Reasons Given: A. Major drug transaction involving
 a large area*
 B. Amount of marijuana substantially more than
 necessary for personal use*

33. *State v. Taatjes,* 43 Wn. App. 109, 715 P.2d 1152, *review denied,* 105 Wn.2d 1020 (1986)
Manufacturing a Controlled Substance
Standard Sentence Range: 6–12 months
Imposed Sentence: 24 months

Reasons Given: A. Sophisticated drug enterprise*
 B. Larger quantities than necessary for personal use*
 C. Significant status in drug distribution system*
 D. Prior history of drug violations*

34. *State v. Tunnel*, 51 Wn. App. 274, 753 P.2d 543, *review denied*, 110 Wn.2d 1036 (1988)
 Statutory Rape, Indecent Liberties
 Standard Sentence Range: 88–116 months
 Imposed Sentence: 264 months
 Reasons Given: A. Continuing pattern of conduct*
 B. Children were seriously impacted by defendant's conduct
 C. Multiple incidents, multiple victims*
 D. Victims particularly vulnerable*
 E. Defendant refused to acknowledge the severity of the offense

35. *State v. Weaver*, 46 Wn. App. 35, 729 P.2d 64 (1986), *review denied*, 107 Wn.2d 1031 (1987)
 Vehicular Assault
 Standard Sentence Range: 3–9 months
 Imposed Sentence: 30 months
 Reasons Given: A. History of alcohol abuse
 B. Disdain for rehabilitation
 C. Driving without insurance
 D. Driving while intoxicated

36. *State v. Wood*, 42 Wn. App. 78, 709 P.2d 1209 (1985), *review denied*, 105 Wn.2d 1010 (1986)
 Indecent Liberties
 Standard Sentence Range: 15–20 months
 Imposed Sentence: 30 months
 Reasons Given: A. Defendant's age
 B. Victim particularly vulnerable*
 C. Prior conviction for incest
 D. Defendant not amenable to treatment

37. *State v. Woody*, 48 Wn. App. 772, 742 P.2d 133 (1987), *review denied*, 110 Wn.2d 1006 (1988)
 Indecent Liberties
 Standard Sentence Range: 15–20 months
 Imposed Sentence: 120 months

Reasons Given: A. Age of victim
B. Knowledge of consequences to victim
C. Future dangerousness

## APPENDIX 2

## REASONS GIVEN BY TRIAL COURTS FOR AN EXCEPTIONAL SENTENCE

*Reasons specifically listed as illustrative in RCW 9.94A.390

| REASON | Number of Times Cited |
|---|---|
| Vulnerable victim* | 63 |
| Seriousness of the offense | 56 |
| Crime was deliberately cruel* | 53 |
| Multiple victims or incidents per victim* | 51 |
| Defendant was in a position of trust* | 44 |
| Defendant used sophisticated/well–planned methods* | 40 |
| Defendant is a threat to the community | 23 |
| Monetary loss greater than typical* | 21 |
| Injuries greater than necessary for the crime | 20 |
| Multiple offense policy would give lenient sentence* | 20 |
| Defendant agreed to prison sentence instead of jail | 17 |
| Factors in criminal record | 16 |
| Drugs sold in quantities too large for personal use* | 14 |
| Drugs manufactured to be used by others* | 7 |
| Defendant has high position in drug hierarchy* | 7 |
| Criminal history score greater than 9 points | 6 |
| Defendant showed no remorse | 6 |
| Defendant violated zone of privacy | 4 |
| Greater treatment available in prison | 4 |
| Sentence will promote respect for the law | 4 |
| Continuing criminal activity after arrest or while on previous probation or parole | 4 |
| Defendant is not amenable to available treatment | 2 |
| Drugs sold at least 3 times* | 2 |

| | |
|---|---:|
| Weapon used for drug crime | 2 |
| No resources in the community | 2 |
| Other | 46 |
| Total | 534 |

After modification, further reconsideration denied January 16, 1990.

Review denied at 114 Wn.2d 1020 (1990).